**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**September 26, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NANCY METZLER,

      Plaintiff-Appellant,

v.

FEDERAL HOME LOAN BANK OF
TOPEKA a/k/a FHL BANK TOPEKA,

      Defendant-Appellee.

No. 04-3412

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 03-CV-4024-SAC)**

---

Stephen D. Lanterman, Sloan, Eisenbarth, Glassman, McEntire & Jarboe, L.L.C.
(Alan V. Johnson, with him on the briefs), Topeka, Kansas, for Plaintiff-
Appellant.

Patricia E. Riley, Weathers & Riley, Topeka, Kansas, for Defendant-Appellee.

---

Before **PORFILIO, EBEL,** Circuit Judges, and **HERRERA,** District Judge.[*]

---

**EBEL**, Circuit Judge.

---

[*]Honorable Judith C. Herrera, District Court Judge, District of New
Mexico, sitting by designation.

Plaintiff-Appellant Nancy Metzler ("Metzler") was formerly an employee of Defendant-Appellee Federal Home Loan Bank of Topeka a/k/a FHL Bank of Topeka ("FHLB"). FHLB terminated Metzler from her position as a Database and Systems Analyst in November 2002. Metzler then filed an action under the Family and Medical Leave Act, 29 U.S.C. §§ 2601-54 ("FMLA") against FHLB alleging: (1) interference with her FMLA-created rights in violation of 29 U.S.C. § 2615(a)(1); and (2) retaliation for exercising her rights under the FMLA in violation of 29 U.S.C. § 2615(a)(2). The district court granted summary judgment for FHLB on both claims. Applying the appropriate summary judgment standard of review,[1] we AFFIRM.

## BACKGROUND[2]

Although Metzler began her employment with FHLB on October 20, 1986, the real conflicts that form the basis of her complaint and this appeal began in September 2002 after the Information Technology ("IT") Department, with whom

---

[1] "We review the grant of summary judgment de novo, and affirm only if the record, considered in the light most favorable to the plaintiff, establishes no genuine issue of material fact." Jones v. Denver Pub. Sch., 427 F.3d 1315, 1318 (10th Cir. 2005) (citations omitted).

[2] In reciting the relevant facts, we view the evidence, and draw reasonable inferences therefrom, in the light most favorable to Metzler. Meiners v. Univ. of Kan., 359 F.3d 1222, 1229 (10th Cir. 2004).

she had worked since 1986, reorganized and placed her under a new supervisor. Both before and after the reorganization, Metzler worked as a Database and Systems Analyst ("DBA"). The formal job description for this position remained unchanged throughout her employment: Metzler was responsible for maintaining FHLB's relation database operating system, called Microsoft Structured Query Language Server ("SQL Server"); installing updates and maintaining the databases, which included "data backups, fine tuning, creating indexes, and reviewing and implementing the designs of the bank's application developers"; and assisting programming staff in technical aspects of application selection, development, and support.

From June 2000 until Metzler's termination, Phil Andruss was the IT Director. Prior to the reorganization, Metzler worked in the Networks and Systems Group of the IT Department under two different immediate supervisors, both of whom lacked the experience needed properly to manage a DBA like Metzler: from 2000 until April 2002, Metzler's immediate supervisor was Steve Montgomery, the Network and Systems Manager; and from April 2002 until the reorganization, Kathleen Grote was Metzler's supervisor.

On September 16, 2002, the IT Department was reorganized. The reorganization created a new group within the IT Department called the Projects and Support Group. With this reorganization, among other things, the

responsibilities for functions involving Data Transformation Services ("DTS") packages, which are standard SQL server tools that any experienced SQL Server administrator should know how to use, and documentation of DTSs and backup procedures moved from the programmers and developers to the new Projects and Support Group. Metzler had used DTS for limited purposes prior to the reorganization.

Chris Miller, who was familiar with SQL Server and the duties of a DBA and had previously performed DTS packages, became the head of the new Project and Support group. Although Miller had not previously acted as Metzler's immediate supervisor, Miller had managed projects in which Metzler participated. Over the years, Miller and Metzler had developed "professional differences of opinion" about the manner in which Metzler operated, or should have operated, her databases.

Three days before the reorganization, Andruss met individually with every IT Department employee who would be reporting to a new manager after the reorganization. During his meeting with Metzler, he informed her that she would be transferred to the new Projects and Support group and placed under Miller's supervision. Metzler responded that she would rather be fired.

Metzler missed work on the first day of the reorganization and worked only part of the next day before going home sick and visiting a doctor. The physician

diagnosed Metzler with work-related stress, depression, anxiety, and related symptoms, and ordered her to stay off work for two weeks. On September 30, the physician ordered her to stay off work for one more week. On October 4, the physician issued Metzler a work release order permitting her to return to half-time work. Metzler returned to work on October 8, working four hours per day until FHLB terminated her employment on November 15. At some time prior to Metzler's return to work on October 8, Miller understood that Metzler planned to request retroactive FMLA leave for the time she had been absent. On October 17, Metzler submitted that request for FMLA leave retroactive to September 17, due to her serious health condition, and FHLB approved the leave on October 18. Metzler was therefore deemed to be on full-time FMLA leave from September 17 until her return to work on October 8, and then on reduced schedule leave upon her return to work.

Upon her return to work on October 8 through her termination, Metzler maintained the same job title, the description of her position remained unchanged, and she received the same pay and benefits that she received both prior to the reorganization and prior to her FMLA leave. However, as Andruss had informed Metzler on September 13, she was now part of the new Projects and Support group and under Miller's supervision. The duties and tasks assigned to Metzler in

this new group required her to use more advanced features of certain tools than she had previously used.

The day after Metzler returned to work part-time, Miller and Michael Smith, an outside consultant with expertise as a DBA, met with Metzler. Miller and Smith testified that Metzler ignored Miller and avoided communicating with her during the meeting. Metzler acknowledges that it is possible she sat with her back to Miller throughout the meeting. That same day, Miller wrote a formal counseling document ("October 9 counseling document"), which reproved Metzler for being uncommunicative, rude behavior, and the unproductive use of her time, and required Metzler to correct these deficiencies. It also required Metzler to update Miller daily regarding her project status and imposed an October 17 deadline for a specific assignment. The October 9 counseling document concluded:

> We need you and your background knowledge, but we cannot afford an employee that cannot work as part of the team and be productive. If these items do not dramatically improve within the next 2 weeks or other deadlines established, you will be counseled further, up to and including termination.

Miller gave the document to Metzler at the end of Metzler's work day on October 9. Miller testified that she issued the October 9 counseling document because she observed that Metzler's unproductive habits and attitude problems were recurring and she wanted Metzler to understand such problems were no longer acceptable.

Metzler signed the document, noted her disagreement, and later submitted a response to it. However, Metzler failed to provide Miller with the daily status reports required by the counseling document until October 15 because Metzler erroneously believed that Miller had access to Metzler's electronic payroll timesheets, which would have reflected the same information.

On October 23, Miller assigned Metzler the task of adjusting certain numbers in one of FHLB's databases with a deadline of the following day, believing the task should take approximately two hours. Metzler explained to Miller, in her report on October 25, that the task would actually take approximately four hours. Metzler completed the assignment seven days later, on October 30. Miller also assigned Metzler the task of reviewing documentation for a backup of a particular system, the network, and the hot site with deadlines of October 25, 28 and 29, respectively for each task. Metzler completed the assignments on November 1.

On October 29, Metzler met with Miller and Dina Cox, FHLB's Director of Human Resources, to discuss the October 9 counseling document. Metzler testified that she told Miller and Cox she thought she was being treated unfairly because of her FMLA leave. During that meeting, Metzler admitted that she missed some deadlines, but expressed her belief that many of these deadlines were unreasonably short. After revisions by Andruss and Cox, Miller completed a final

version of a written response to Metzler's objections to the October 9 counseling document, which stated, among other things:

> I strongly disagree with Nancy [Metzler]'s position that she should not have to perform like everyone else because she has been ill. Nancy & her Doctor decided the appropriate time she could come back to work and that she would be able to work 4 hours per day. The expectation is that she would work and be productive for those 4 hours each day. Nancy seems to think she should have a "transition period" of showing up for work but not having to really do anything.

On November 4, Miller assigned Metzler to write a series of six DTS packages to transfer data from one database to another. Miller estimated that the first package would require three hours and the other five would require two hours each—a total of 13 hours—and set the deadlines for these tasks as November 4, 5, 6, and 7. Before delivering these assignments to Metzler, Miller had her time estimations reviewed by Smith, the outside consultant with expertise as a DBS; Andruss, the IT Director; and Bill McSpadden, the bank's applications development manager, to ensure the amount of time given was reasonable. All three told Miller her time estimations were reasonable.

On the same day that Miller gave Metzler the assignments and corresponding deadlines, Metzler complained about one particular deadline to her co-worker, Anita Wright. Wright, in turn, spoke with Cox and told her that "it looked like a couple more hours needed to be added to several of Miller's time estimates." Cox, in turn, spoke to Miller about <u>one</u> specific deadline, and Miller

extended it from three to twelve hours. Between November 4, when the tasks were assigned, and November 15, when FHLB terminated her, Metzler worked forty hours. As of her termination, however, Metzler had not completed any of the six DTS packages assignments.

Miller drafted another counseling document on the same day she extended Metzler's deadline by nine hours, which criticized Metzler for lack of productivity and missed deadlines. After Miller gave the document to Cox for review, Cox advised Miller not to deliver it to Metzler. Instead, over the next few weeks Cox held several meetings—including one on November 7 and another on November 13—between herself, Metzler, Miller, and at least once, Andruss, to attempt to improve Metzler's productivity and communications between Metzler and Miller. During these meetings, Metzler was not informed that her work performance was so deficient that her job was in jeopardy.

On November 11, Miller prepared a memorandum to Andruss and Brad Hodges, FHLB's Senior Vice President for Housing, Technology and Planning, recommending that Metzler's employment be terminated ("November 11 memo"). Then, on November 13, Miller prepared another counseling document that she intended to deliver to Metzler, but she first gave to it Cox to review. Cox advised Miller to proceed with termination rather than deliver the counseling statement.

Later that day, Miller, Cox, Andruss, and Hodges met to discuss whether Metzler was able to meet her assigned job responsibilities or whether FHLB needed to find someone else who could produce the level of work required. Cox testified that the decision to terminate Metzler due to the effect of Metzler's failure to meet deadlines, her uncooperativeness, and the effect of her negative attitude on the whole team was made jointly and based, at least partially, on Miller's November 11 memo. FHLB terminated Metzler's employment effective November 15, 2002.

Metzler then brought an action in federal district court for the District of Kansas alleging violations of 29 U.S.C. § 2615(a)(1) and (2) of the FMLA. In an order dated September 21, 2004, the district court granted summary judgment for FHLB on the § 2615(a)(1) claim after finding that Metzler failed to state a viable interference claim and that her claim was more properly analyzed as a retaliation claim. The district court further found that Metzler failed to show pretext and granted summary judgment for FHLB on the § 2615(a)(2) retaliation claim. On appeal, Metzler argues that she stated a viable claim for FMLA interference and that the district court erred in granting summary judgment for FHLB on both her § 2615(a)(1) and (2) claims.

**DISCUSSION**

This circuit has recognized two theories of recovery under § 2615(a): an entitlement or interference theory arising from § 2615(a)(1), and a retaliation or discrimination theory arising from § 2615(a)(2).[3]  See Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 960 (10th Cir. 2002).  The distinction between these two theories is important because the elements and burdens of proof that apply to § 2615(a)(1) claims differ from those that apply to § 2615(a)(2) claims, see id. at 960-62, and we therefore analyze Metzler's claims separately.

## I.      Retaliation Claim

Retaliation claims under the FMLA are subject to the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). See Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117, 1135 (10th Cir. 2003).

---

[3]  Section 2615(a) provides:

(a) Interference with rights

> (1) Exercise of rights
> It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
> (2) Discrimination
> It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a).  Employees are authorized under 29 U.S.C.§ 2617(a) to bring a cause of action for violations of § 2615(a).

Under this analysis, the plaintiff bears the initial burden of establishing a prima facie case of retaliation.  Id.  If the plaintiff does so, then the defendant must offer a legitimate, non-retaliatory reason for the employment action.  Id.  The plaintiff then bears the ultimate burden of demonstrating that the defendant's proffered reason is pretextual.  Id.; see also Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1263 (10th Cir.1998) (explaining that plaintiff has the ultimate burden of demonstrating that the challenged employment decision was the result of intentional retaliation).

A.      Prima Facie Case of Retaliation

To state a prima facie case of retaliation, Metzler must show that: (1) she engaged in a protected activity; (2) FHLB took an action that a reasonable employee would have found materially adverse;[4] and (3) there exists a causal

---

[4] We had previously held that a prima facie case of retaliation under both Title VII and the FMLA required an "adverse employment action." See, e.g., Maldonado v. City of Altus, 433 F.3d 1294, 1308 (10th Cir. 2006) (Title VII); Chavez v. Thomas & Betts Corp., 396 F.3d 1088, 1104 (10th Cir. 2005) (FMLA). We noted in Argo v. Blue Cross & Blue Shield of Kansas, Inc., 452 F.3d 1193 (10th Cir. 2006), however, that the Supreme Court recently rejected our "adverse employment action standard," by holding that a Title VII retaliation claim plaintiff "need only show 'that a reasonable employee would have found the challenged action materially adverse.'" Id. at 1202 n.2 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2414-15 (2006)).  Subsequently, we

(continued...)

connection between the protected activity and the adverse action.  See Argo, 452

F.3d at 1202; Chavez, 396 F.3d at 1104.  The first two of these requirements are

clearly met in this case—Metzler engaged in a protected activity by taking FMLA

leave for a serious health condition and FHLB was aware of such leave, and any

reasonable employee would have found termination materially adverse.  The third

element, then, remains the only one on which it is questionable whether Metzler

made a sufficient showing.

To establish the third element of a prima facie case of retaliation, Metzler

must show a causal connection between her protected activity of taking FMLA

leave and FHLB's decision to terminate her employment.  The "critical inquiry" at

this prima facie stage is "whether the plaintiff has demonstrated that the

[employer's] action occurred under circumstances which give rise to an inference

of unlawful discrimination."  Garrett v. Hewlett-Packard Co., 305 F.3d 1210,

---

[4](...continued)
extended White to ADEA and ADA plaintiffs.  See Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 2006 WL 2258836, at *1, 8 (10th Cir. 2006) (holding that a Title VII, ADEA, or ADA plaintiff must show: "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action") (quotations omitted).  Because "[t]he FMLA's [retaliation] clause is 'derived from Title VII and is [thus] intended to be construed in the same manner,'" Duckworth v. Pratt & Whitney, Inc., 152 F.3d 1, 9 n.8 (1st Cir. 1998) (alterations omitted) (quoting S. Rep. No. 103-3, at 34 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 36), the Supreme Court's rejection of our "adverse employment action" requirement applies with equal force in the context of an FMLA retaliation case.

1221 (10th Cir. 2002) (quotations omitted).  We have repeatedly recognized

temporal proximity between protected conduct and termination as relevant

evidence of a causal connection sufficient to "justify an inference of retaliatory

motive."  See, e.g., Haynes, 456 F.3d 1215, 2006 WL 2258836, at *9.  We have

emphasized, however, that a plaintiff may rely on temporal proximity alone only

if "the termination is very closely connected in time to the protected activity."

Anderson v. Coors Brewing, 181 F.3d 1171, 1179 (10th Cir. 1999) (emphasis in

original).

Here, the record indicates that Metzler submitted her formal request for

retroactive FMLA leave on October 17, 2002 and that FHLB approved it the

following day.  Viewed in a light most favorable to Metzler, the record also

indicates that Miller knew of Metzler's intent to invoke FMLA rights for her

absence sometime between the beginning of Metzler's absence from work

(September 17) and her return to work (October 8).  As a result, Metzler's

termination occurred at most about 6 weeks after FHLB knew Metzler intended to

engage in protected activity and within as little as four weeks of Metzler's request

for FMLA-protected leave.  Because her termination was therefore "very closely

connected in time" to her protected FMLA activity, id., she has established the

third, and final, element of her prima facie case.  Compare Ramirez v. Okla. Dept.

of Mental Health, 41 F.3d 584, 596 (10th Cir. 1994) (holding that a one and one-

- 14 -

half month period between the protected activity and the adverse action may, by itself, establish causation), overruled on other grounds by Ellis v. Univ. of Kan. Med. Ctr., 163 F.3d 1186 (10th Cir. 1998), with Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (deciding that a period of three months between the protected activity and the adverse action, standing alone, is not sufficient to establish causation).

## B. Legitimate, Nonretaliatory Reason for Termination

Having established her prima facie case, the burden under McDonnell Douglas then shifts to FHLB to demonstrate a legitimate, nonretaliatory reason for its termination decision. See Doebele, 342 F.3d at 1135. FHLB asserts that it fired Metzler due to her poor job performance, poor attitude, and failure to maintain adequate job-related skills. Because these reasons are not facially prohibited, the district court correctly concluded that FHLB articulated a legitimate, nonretaliatory reason for terminating Metzler's employment.

## C. Pretext

To defeat summary judgment, then, Metzler must show that there is a genuine dispute of material fact as to whether FHLB's explanations for terminating her employment are pretextual. See Mickelson v. New York Life Ins. Co., — F.3d — , 2006 WL 2468302, at *11 (10th Cir. 2006); Chavez, 396 F.3d at 1104. To establish pretext, Metzler relies on six pieces of circumstantial evidence

- 15 -

allegedly establishing: (1) the proximate timing of her termination; (2) a pattern of retaliatory conduct; (3) FHLB's prior treatment of her; (4) FHLB's action contrary to its handbook policy; (5) FHLB's documentation of her file in anticipation of litigation; and (6) proof that FHLB's explanation is unworthy of credence.

### 1.    Timing of Metzler's termination

It is undisputed that FHLB discharged Metzler during her FMLA leave. Although temporal proximity is one relevant factor to be considered by the courts in determining whether the employer's explanation is a pretext for retaliation, this court has refused to allow even "'very close' temporal proximity to operate as a proxy for th[e] evidentiary requirement" that the plaintiff demonstrate pretext. Annett v. Univ. of Kan., 371 F.3d 1233, 1241 (10th Cir. 2004); Medina v. Income Support Div., 413 F.3d 1131, 1138 (10th Cir. 2005) ("[Temporal proximity] is not alone sufficient to defeat summary judgment.") (quotations omitted). To raise a fact issue of pretext, Metzler must therefore present evidence of temporal proximity plus circumstantial evidence of retaliatory motive. See, e.g., Pastran v. K-Mart Corp., 210 F.3d 1201, 1206-07 (10th Cir. 2000). Here, Metzler relies on the five other pieces of circumstantial evidence to demonstrate that FHLB's alleged explanation for her termination, in addition to the temporal proximity of

her termination and exercise of protected rights, was a pretext for retaliatory discharge.

### 2. A pattern of retaliatory conduct

Relying on our decision in <u>Marx v. Schnuck Markets, Inc.</u>, 76 F.3d 324 (10th Cir. 1996), Metzler contends that FHLB engaged in a pattern of retaliatory conduct beginning soon after she returned on reduced schedule FMLA leave, which she argues demonstrates pretext. Specifically, Metzler alleges that pattern began with FHLB issuing the October 9 counseling document; continued when FHLB assigned new job duties to Metzler, failed to give her adequate training to perform those new duties, then imposed unreasonable deadlines for completion of those duties; and ultimately culminated in terminating her employment. Although a pattern of retaliatory actions taken by a defendant may preclude summary judgment, <u>id.</u> at 329, Metzler has not established a pattern of conduct giving rise to an inference of retaliatory animus.

Even assuming Metzler was assigned new duties upon her return from full-time FMLA leave, rather than upon the IT section's reorganization,[5] there was no

_____

[5] Metzler alleges that her three new duties related to DTS packages. We note that these allegedly new duties and tasks merely required Metzler to use more advanced features of certain tools than she acknowledged previously using as a DBA. It is therefore not clear that her assignments were actually "new." At her deposition, Metzler admitted that the reorganization shifted the responsibility for writing and documenting application-related DTS packages from the

(continued...)

evidence that the duties were assigned to her in retaliation for taking FMLA leave. Metzler therefore failed to set forth, by sufficient affidavits or other evidence, that she was assigned new duties in retaliation for exercising FMLA rights.

Additionally, the record does not support her claim that FHLB failed to provide sufficient training and resources regarding these allegedly new duties. Metzler's job description explicitly stated that she was expected to be able to quickly assimilate and use new technology required to perform her responsibilities. Metzler acknowledged that DTS was a standard DBA tool and that the use of that tool for applications could be learned from manuals and online help resources available to Metzler. Thus, Metzler has also not raised a genuine issue of material fact regarding whether the training or resources provided by FHLB suggests pretext.

Finally, nothing about the time estimates within which Metzler was to complete the new job duties suggests pretext. The record indicates that the deadlines imposed on Metzler were developed by Miller (who Metzler describes as having at least some background in SQL servers), and were reviewed by Michael Smith (an outside consultant with DBA expertise) and Bill McSpadden

---

[5](...continued)
programmers to Metzler and Anita Wright, who were part of the new Projects and Support group.

(FHLB's applications development manager who also had some experience as a DBA). The record also indicates that both Smith and McSpadden assured Miller that her time estimates for the assignments were reasonable, and that Miller adjusted the one time estimate brought to her attention by Metzler as mistaken. Thus, nothing in the record suggests that the deadlines imposed on Metzler were generally unreasonable or that any mistake in the time estimations was the result of retaliation rather than oversight. E.E.O.C. v. Flasher Co., Inc., 986 F.2d 1312, 1322 n.12 (10th Cir. 1992) ("[A] mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual.").

This leaves only the October 9 counseling document. A single event cannot logically constitute a pattern of retaliatory conduct sufficient to raise an inference of pretext. In any event, we note that FHLB expressed some concern about Metzler's performance and attitude before she took FMLA-protected leave, which weakens the relevance of the temporal proximity between the October 9 counseling document and the protected activity. See Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002) ("Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity."). Accordingly, Metzler has not demonstrated a pattern of retaliatory conduct beginning soon after she

engaged in protected activity and culminating in her eventual discharge that gives rise to the inference that her termination was retaliatory.

### 3. FHLB's prior treatment of Metzler

Metzler asserts, as her third piece of circumstantial evidence demonstrating pretext, that FHLB's treatment of her after she invoked her FMLA rights differed from FHLB's prior treatment of her. Metzler contends that, prior to October 8, she had never received a written counseling statement from any of her managers. Additionally, Metzler received overall performance ratings of "Meets Expectations" on her performance evaluation in 1997, 1998, 1999, 2000, and 2001 (her final year reviewed). For each of these years, Metzler also received ratings of "Successful" in the areas of "Works Well With Others" and "Works Efficiently." After her reduced leave schedule began, Metzler received the October 9 counseling document, was required to attend at least two counseling meetings (November 7 and November 11), and was then discharged on November 15 for poor performance and attitude. Metzler claims that this evidence raises an inference of retaliatory motive under our holding in Simms v. Oklahoma ex rel. Dept. of Mental Health, 165 F.3d 1321 (10th Cir. 1999).

While "[e]vidence of pretext may include . . . prior treatment of plaintiff," id. at 1328; see also Garrett, 305 F.3d at 1217 (same), the record does not support Metzler's claim that her evaluations after October 8 differed materially in an

- 20 -

unexplained way from her evaluations before that date.[6] Instead, the record indicates that Metzler's last three annual evaluations contained negative comments about her job skills and/or attitude. Additionally, the record indicates that multiple FHLB managers or consultants expressed doubts about Metzler's performance months before the reorganization and her invocation of FMLA rights. For example, in March of 2002, Brad Hodges (IT Director Andruss's supervisor) stated, in a memo to Andruss, that he believed Metzler had "retired on the job" and suggested that she be asked to resign to "replace [the] position with needed skill set." Andruss described Metzler as "on the bubble" and in need of immediate improvement of her skill set, and recommended, in a report dated August 19, 2002, that Metzler be put on an eight-week probation so that "[a] recommendation will be developed to either retain Nancy or if she is unable to adjust to the new reporting structure and discipline imposed . . . she will be replaced."

---

[6] In regard to Metzler's job skills, her annual evaluations contain suggestions for areas of improvement such as: "[c]ontinue to strive to learn more about the Bank's business"; "[c]ontinued growth of technical skills through specialized training"; "work on your general NT and network knowledge." Additionally, in regard to her attitude, her 2000 evaluation states "trying to maintain a positive and accepting attitude toward teammates and coworkers. . . . [T]here are times when you seem to become dissatisfied . . . . I'm concerned that your sometimes-negativism is causing others . . . to feel you unapproachable at times. . . ."

Additionally, people outside the chain of command at FHLB expressed concern about Metzler. In April or May 2002, Michael Smith, who was hired by FHLB as an outside manager consultant, interviewed each of the employees of the IT Department in an attempt to assess where they might fit in a reorganized department. After his interview with Metzler, he stated in his June 2002 report that:

> I have struggled for the past couple of months to examine the future of Nancy [Metzler] with FHLB. . . . I feel that her skills are adequate, but not exceptional. I believe that Nancy can do the job that she is responsible for, but I am not sure how dedicated she is to that effort.
> . . .
> Overall, I feel that Nancy is a possible fit for FHLB. With Bill [Montgomery's] evaluation as she reports to him, FHLB will be able to know if Nancy's skills will be a good fit for the bank.

Thus, as the district court found, "the documentation of plaintiff's job skills and attitude prior to October 8 is not so distinctively different from documentation of the same after that date . . . ."

Although Metzler's evaluations before her FMLA leave are to some extent similar to her evaluations after her leave, we have previously held that prior negative comments on their own do not automatically negate an inference of pretext. See Garrett, 305 F.3d at 1218-19 (stating that "the mere fact that [the employee's] evaluations bear evidence of past criticism of his work habits does not negate the possibility that the justifications given for [the employee's] . . . negative evaluations . . . are pretextual. A jury could reasonably infer that [the

- 22 -

employee's] supervisors discriminated against him by inflating and exaggerating long-standing critiques of his performance as a means of exercising racist and ageist animus towards him").  However, there is no evidence in this case to suggest that FHLB's criticism of Metzler was "inflat[ed] and exaggerat[ed]" as a means of retaliating against Metzler.  Instead, the evidence indicates that any change in FHLB's treatment of Metzler coincided with her placement under a new supervisor—Miller—after the reorganization.

We have previously held that a plaintiff may show pretext by "providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000).  In this context, we have defined similarly situated employees as "those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." Rivera v. City and County of Denver, 365 F.3d 912, 922 (10th Cir. 2004) (quotations omitted).  Based on this definition, we have held that pretext cannot be inferred where, for example, one supervisor treats one employee one way and another supervisor treats another employee a different way, reasoning that "'[d]ifferent supervisors will inevitably react differently to employee insubordination.'" Id. (quoting Kendrick, 220 F.3d at 1233).

Although Metzler does not claim that she was treated differently than other FHLB employees, she does assert that FHLB's treatment of her prior to taking FMLA leave differed from FHLB's treatment of her after taking such leave. Applying the appropriate analog from cases like <u>Kendrick</u> and <u>Rivera</u>, we do not infer pretext from FHLB's different treatment of Metzler where the alleged different treatment was inflicted by different supervisors—that is, treatment by her pre-reorganization supervisors (Montgomery and Grote) as compared to treatment by her post-reorganization supervisor (Miller)—because any difference may be the result of different supervisor's reactions.[7] Considering that one of the

_____

[7] Other courts have similarly held that drawing an inference of pretext "is even less permissible when a new supervisor is appointed, who is entitled to set his own standards and agenda." <u>Valdivia v. Univ. of Kan. Med. Ctr.</u>, 24 F. Supp. 2d 1169, 1174 (D. Kan. 1998) (quotations omitted); <u>see also</u> <u>Rojas v. Florida</u>, 285 F.3d 1339, 1343 (11th Cir. 2002) (holding that differences in the evaluation of an employee's performance do not establish a genuine issue on pretext because "[d]ifferent supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important"); <u>Rodriguez-Cuervos v. Wal-Mart Stores, Inc.</u>, 181 F.3d 15, 20 (1st Cir. 1999) (finding that the evidence failed to support a finding of pretext after noting that "[t]he problem with . . . relying on [the employee's] past performance evaluations" is that it "fails to take into account the fact that [the employee] was working in different capacities at different stores, under different supervisors with different expectations" and disregards the fact that the new supervisor "may have had different expectations for [the employee], even if those expectations were contrary to those of . . . prior supervisors"); <u>Orisek v. Am. Inst. of Aeronautics and Astronautics</u>, 938 F. Supp. 185, 191 (S.D.N.Y. 1996) (stating that "[a] new manager is allowed to appraise an employee's work according to his or her own expectations, even if those expectations are contrary to a prior manager's expectations") (quotations omitted). <u>But see</u> <u>Thomas v.</u>

(continued...)

- 24 -

major reasons for reorganizing the IT Department was to have "a team in place that affords a reasonable probability of success" in effectively developing and implementing FHLB's "technology plan," the imposition of stricter work standards is reasonable. Thus, even if the October 9 counseling document reflects these stricter standards or higher expectations by a new manager, it does not constitute evidence that Miller's—or the other FHLB supervisors', for that matter—application of those standards was pretextual. Ultimately then, on this record, Metzler has not established that the change in FHLB's treatment of Metzler was based on her invocation of FMLA rights rather than the imposition of different standards of behavior and performance by her new supervisor.

### 4. FHLB's action contrary to handbook policy

Metzler contends that, according to the FHLB Employee Handbook, it was written company policy that "an employee will be informed if corrective action is necessary as soon as possible after any deficiency in standard of behavior or performance has been identified." We agree that demonstrating that "the defendant acted contrary to a written company policy prescribing the action to be

---

[7](...continued)
Eastman Kodak Co., 183 F.3d 38, 62 (1st Cir. 1999) (finding that the employee met her burden of showing pretext where the employee's scores dropped sharply after she began working under a new supervisor, without indication that the new supervisor was simply a "tough grader," especially where the employee's scores appeared low when compared to the scores of other employees under the same new supervisor).

taken by the defendant under the circumstances" may in an appropriate case give rise to a fact issue regarding pretext. Kendrick, 220 F.3d at 1230. However, the facts of this case do not support such a conclusion.

Here, even if FHLB's Employee Handbook is interpreted to require FHLB to warn employees that identified deficiencies could result in termination,[8] rather than merely requiring FHLB to inform employees of the deficiencies, the uncontested facts show that FHLB provided such a warning to Metzler. The October 9 counseling document, which Metzler admits receiving, explicitly warned that "if [certain deficiencies] do not dramatically improve within the next 2 weeks or other deadlines established, you will be counseled further, up to and including termination." (emphasis added). FHLB therefore complied with its Employee Handbook policy. Metzler therefore has not raised a genuine fact issue regarding whether FHLB complied with the written company policies in its Employee Handbook.

### 5. FHLB's documentation of Metzler's file in anticipation of litigation

The fifth piece of circumstantial evidence upon which Metzler relies to show pretext consists of FHLB "documenting [Metzler's] file 'in anticipation of

---

[8] The district court concluded that FHLB's Employee Handbook does not require FHLB to provide such a warning to Metzler. The district court concluded that FHLB complied with the Employee Handbook by informing Metzler in the October 9 counseling document of deficiencies in her behavior and performance.

- 26 -

litigation.'" We have previously held that a reasonable jury might consider testimony that documents were prepared in anticipation of litigation as circumstantial evidence of retaliatory motive. Pastran, 210 F.3d at 1206. Metzler asserts that this case is analogous to Pastran because Miller acknowledged in a November 11, 2002 memo that she was to "document problems [with Metzler] enough so the Bank was not at risk of losing a lawsuit for unjustified termination," and because she did in fact so document the file with the assistance of Andruss and Cox.

We agree with the district court's conclusion that Pastran, as well as other appellate decisions recognizing documentation in anticipation of litigation as evidence of pretext, are distinguishable from this case. In Pastran, the employee called his employer to ask whether he had lost his job. 210 F.3d at 1204. After replying that he was not sure, the manager consulted with his supervisor and the employer's legal department about preparing statements regarding past employment action taken in relation to the employee. Id. The suspicious timing of that documentation—after the fact and in anticipation of litigation—reasonably gave rise to an inference of pretext. Id. at 1206; compare Walton v. Nalco Chem. Co., 272 F.3d 13, 23-24 (1st Cir. 2001) (holding that a "jury reasonably could have found that [the employer] orchestrated [the employment document] as pretextual support for its [discriminatory] decision to discharge [the employee],"

where the document was prepared only after the employer received notification from the employee's attorney claiming age discrimination); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000) (stating that pretext may be established with evidence that "nondiscriminatory reasons were after-the-fact justifications, provided subsequent to the beginning of legal action"), with Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 17 (1st Cir. 1998) (holding that the employee failed to demonstrate that the employer's reasons for demoting the employee were pretextual where there was no evidence that management notes were produced after the employee filed suit instead of contemporaneously with the employee's training).

Here, Miller testified that she documented the performance of Metzler, and all of her other subordinates, contemporaneously with her dealings with them. And no evidence suggests otherwise. Although Miller's statement in her November 11 memo that part of her goal was to document Metzler's file to avoid the "risk of losing a lawsuit for unjustified termination" because FHLB "may have a lawsuit problem with [Metzler]" gives rise to an inference of retaliatory motive, "we do not understand why it is improper for an employer to maintain records regarding an employee's conduct even if it recognizes that the record may be useful in defense against a discrimination claim. Indeed, it would be expected that an employer would do exactly that." Billet v. CIGNA Corp., 940 F.2d 812,

826 (3d Cir. 1991), <u>overruled in part on other grounds by St. Mary's Honor Ctr. v.</u> <u>Hicks</u>, 509 U.S. 502 (1993), <u>and by</u> <u>O'Connor v. Consolidated Coin Caterers</u> <u>Corp.</u>, 517 U.S. 308 (1996). We therefore conclude that FHLB's contemporaneous documenting of Metzler's file does not suggest that FHLB created the documents as pretextual support for her retaliatory termination, even if the documents were in part created to avoid or defend against possible future litigation.

### 6.      Proof that FHLB's explanation is unworthy of credence

Relying on <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133 (2000), the final piece of circumstantial evidence that Metzler claims demonstrates a pretextual explanation for her termination consists of "proof that [FHLB's] explanation is unworthy of credence." Specifically, Metzler relies on the United States Supreme Court's explanation that:

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. . . . Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

<u>Id.</u> at 147 (2000) (citations omitted); <u>see also</u> <u>Kendrick</u>, 220 F.3d at 1230 ("A plaintiff typically makes a showing of pretext . . . with evidence that the defendant's stated reason for the adverse employment action was false. . . .").

Metzler asserts that FHLB's explanations of her termination—poor performance and poor attitude—were false.  In regard to poor performance, Metzler does not controvert FHLB's evidence that she missed most, if not all, of the deadlines imposed for her tasks from October 9 to the date of her termination.  Instead, Metzler again argues that several of Miller's time estimates were unreasonable and that a reasonable jury could thus infer a retaliatory motive for FHLB's termination of her employment.

Metzler's mere allegation that Miller did not honestly believe her time estimations were reasonable, without any supporting evidence, does not raise a genuine issue of material fact, especially in light of other undisputed evidence in the record.  See Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 530 (10th Cir. 1994) (stating that "allegations alone will not defeat summary judgment").  Specifically, the record indicates that Miller delivered to Metzler the time estimates for her assignments only after she had them reviewed by Smith and McSpadden, both of whom assured Miller that the time estimates were reasonable.  The fact that the time estimates may have been incorrect does not give rise to an inference that Miller, Smith, or McSpadden did not honestly believe Miller's time estimations were reasonable because "a mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual."  Flasher, 986 F.2d at 1322 n.12; see also McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129

(10th Cir. 1998) (explaining that the test for converting an articulated motivating

reason into pretext is "good faith belief").

Furthermore, the actual decision to terminate her was made by Cox,

Andruss, Hodges, and Andrew Jetter, FHLB's President. Although the evidence

indicates that decision was based on Miller's November 11 memo outlining

Metzler's performance and attitude problems and her failure to meet project

deadlines, there is no evidence to support a claim that the FHLB decision-makers

did not honestly believe the reasons stated in Miller's November 11 memo.[9] This

is important because we have held that "a challenge of pretext requires us to look

at the facts as they appear to the person making the decision to terminate

plaintiff." Kendrick, 220 F.3d at 1231; see also Pastran, 210 F.3d at 1206

(explaining that "[t]he pertinent question in determining pretext is not whether the

employer was right to think the employee engaged in misconduct, but whether

---

[9] We note that in certain circumstances, an employer can be held liable for a subordinate employee's prejudice even if the decision-maker lacked the required intent where the decision-maker failed to independently investigate the subordinate's complaint against the former employee and instead merely followed the biased recommendation of the subordinate. See English v. Colo. Dept. of Corr., 248 F.3d 1002, 1011 (10th Cir. 2001) (referring to this as a "cat's paw" theory). The district court refused to consider this theory, however, after concluding that Metzler raised it for the first time in her summary judgment reply brief without ever raising it in her initial response to FHLB's motion for summary judgment. Metzler has not raised this issue on appeal, and we therefore need not determine whether the district court properly disregarded it. See State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994).

that belief was genuine or pretextual") (quotations omitted). Without evidence indicating that these decision-makers did not honestly believe the reasons expressed in Miller's November 11 memo, Metzler has not raised a genuine issue of material fact regarding FHLB's explanation that Metzler was terminated, in part, because she repeatedly missed deadlines.

FHLB also claims that it terminated Metzler because of her poor attitude and failure to maintain adequate job-related skills. Metzler generally disputes that her attitude was as FHLB describes and that her knowledge and performance were as FHLB assessed. Even assuming Metzler subjectively believed she did not have a poor attitude or that her knowledge and performance were up to par, "[i]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of [her] own relative performance." Furr v. Seagate Tech., Inc., 82 F.3d 980, 988 (10th Cir. 1996). No evidence suggests that Miller, or the FHLB decision-makers, did not genuinely perceive Metzler as having a poor attitude and inadequate job skills. Accordingly, Metzler has not raised a genuine issue of material fact regarding FHLB's explanation that Metzler was terminated, in part, because of a poor attitude and lack of adequate job skills.

### D. Conclusion

While evidence of temporal proximity in combination with additional circumstantial evidence may give rise to an genuine issue of material fact regarding whether an employer offered a pretextual reason for terminating an employee, see Marx, 76 F.3d at 329, the record in this case indicates that Metzler was terminated for her failure to meet deadlines and other poor job performance, poor attitude, and failure to maintain adequate job-related skills. Without evidence to demonstrate that FHLB's given reasons for terminating her are so weak, implausible, inconsistent, incoherent, or contradictory as to support a reasonable inference that FHLB did not act for those reasons, see Medina, 413 F.3d at 1138, we conclude that Metzler has failed to meet her burden to demonstrate pretext. Accordingly, we AFFIRM summary judgment in favor of FHLB on Metzler's FMLA retaliation claim.

## II. Interference or Entitlement Claim

The FMLA guarantees the substantive rights of up to twelve weeks of unpaid leave for eligible employees of covered employers for serious health conditions and reinstatement to the former position or an equivalent one upon return from that leave. 29 U.S.C. §§ 2612(a)(1), 2614(a). Under the FMLA, an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." Id. § 2615(a)(1). To prevail on an interference or entitlement theory, the plaintiff must demonstrate: "(1) that

he [or she] was entitled to FMLA leave, (2) that some adverse action by the employer interfered with his [or her] right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights." Jones, 427 F.3d at 1319. Under this theory, a denial, interference, or restraint of FMLA rights is a violation regardless of the employer's intent, Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 877 (10th Cir. 2004) (citing Smith, 298 F.3d at 960), and the McDonnell Douglas burden-shifting analysis does not apply to interference claims, Smith 298 F.3d at 963.

Section 2615(a)(1) is nevertheless not a strict liability statute. See 29 U.S.C. § 2614(a)(3)(B) ("Nothing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."); 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."); see also Smith, 298 F.3d at 960 ("[A]n employee who requests FMLA leave would have no greater protections against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request.") (quotations omitted). Thus, "an employee may be dismissed, preventing her from exercising her statutory

right to FMLA leave [or reinstatement after leave] . . . if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." Smith, 298 F.3d at 961 (citing Gunnell, 152 F.3d at 1262). The burden to demonstrate that "an employee, laid off during FMLA leave, would have been dismissed regardless of the employee's request for, or taking of, FMLA leave" is on the defendant-employer. Id. at 963; see also 29 C.F.R. § 825.216(a) ("An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment.").

FHLB stipulated that Metzler was entitled to FMLA leave for a serious medical condition, thereby establishing the first element of her prima facie case. In regard to the second element, Metzler contends the defendant interfered with her FMLA substantive rights by wrongfully terminating her employment for deficiently performing new job duties, which were assigned to her upon her return from FMLA and for which FHLB failed adequately to train her to perform.[10] By

_____

[10] The district court granted FHLB's motion for summary judgment on Metzler's interference claim based, in part, on its conclusion that, "[b]y failing to make any substantive arguments concerning her theories regarding new jobs and failure to train, plaintiff . . . waived them as independent [interference] claims." Metzler does not contend that she did in fact argue new duties and failure to train as independent theories of interference in the brief she submitted to the district court, nor does she challenge the district court's determination that she waived these theories as independent claims. Instead, Metzler properly focuses her

(continued...)

- 35 -

terminating Metzler's employment, FHLB interfered with her right to take up to the twelve weeks to which she was entitled under § 2612(a)(1) and denied her the right to be reinstated to her former position or an equivalent one upon her return to full-time work, thereby establishing the second element of Metzler's prima facie interference claim.[11]  The critical inquiry, then, is whether Metzler has alleged and presented evidence that there is a causal connection between her termination and her exercise of FMLA rights—the third element of her prima facie case.

---

[10](...continued)
interference claim on her termination, rather than the alleged assignment of new duties or failure to adequately train her to perform those duties, because only her termination caused her to suffer lost compensation and other actual monetary losses.  See Walker v. United Parcel Serv., Inc., 240 F.3d 1268, 1278 (10th Cir. 2001) ("Section 2617(a)(1) does not provide for compensatory damages in general, but is instead expressly limited to lost compensation and other actual monetary losses.").  Whether new duties and failure to train constitute independent interference claims is therefore not before us, and we therefore focus only on Metzler's termination theory.  Mhoon, 31 F.3d at 984 n.7.

[11]  The district court concluded that Metzler's interference claim arising from her termination theory was properly analyzed as a retaliation claim not an interference claim, and it therefore ruled that Metzler failed to state a viable interference claim.  Based on the allegations in this case, we disagree with that conclusion.  See Smith, 298 F.3d at 961-62 (affirming the district court's denial of the employer's motion for judgment notwithstanding the verdict where the employee properly alleged and proved an interference by termination claim; stating "[t]he fact that the interference/entitlement theory and the retaliation/discrimination theory are recognized as separate theories makes it evident . . .that retaliation is not the only impermissible reason for dismissal" ).

Metzler contends that a causal connection exists based on the following chain of events: Metzler took reduced leave, as a result FHLB adjusted her duties but failed to adequately train her for them, as a further result she performed the duties deficiently, and as an ultimate result FHLB terminated her employment. Fatally, however, in her deposition Metzler could not state her FMLA leave as the reason FHLB assigned new duties to her. This concession breaks Metzler's alleged causal chain. Accordingly, "any reason for terminating [her] employment would not involve FMLA, and consequently that statute can offer [her] no relief" on her interference claim. Gunnell, 152 F.3d at 1262 (affirming summary judgment in favor of employer on employee's interference claim, where the employee specifically refused to argue that she was fired because of her FMLA request and, consequently, employee failed to demonstrate that her FMLA leave was connected to her termination). Summary judgment on Metzler's interference claim was therefore appropriate.[12]

---

[12] As noted earlier, Section 2615(a)(1) is not a strict liability statute. See 29 U.S.C. § 2614(a)(3)(B); 29 C.F.R. § 825.216(a); see also Smith, 298 F.3d at 960. Even if Metzler established her prima facie case of showing a causal relationship between her claim of FHLB benefits and her termination (which she did not show), summary judgment in FHLB's favor is still appropriate if FHLB demonstrates that she would have been dismissed "regardless of [her] request for or taking of FMLA leave." Smith, 298 F.3d at 961. FHLB has met this burden. As noted in our analysis of Metzler's retaliation claim, the record in this case, even when viewed in a light most favorable to Metzler, indicates that FHLB had previously given Metzler at least one warning—the October 9 counseling

(continued...)

**CONCLUSION**

For the foregoing reasons, we AFFIRM the judgment of the district court granting summary judgment in favor of FHLB on both Metzler's retaliation claim and her interference claim.

---

[12](...continued)
document—that the failure to improve her attitude and meet important deadlines could lead to her termination. Metzler does not deny that she subsequently failed to meet deadlines, which were imposed by her immediate supervisor and determined reasonable by others within and outside FHLB. The evidence therefore supports FHLB's claim that Metzler would have been terminated for failure to meet deadlines regardless of her FMLA leave. See Bones, 366 F.3d at 877-78 (affirming summary judgment for the employer on employee's interference claim where the evidence demonstrated that the employee had a history of tardiness and non-compliance with the absentee policy; the employer had previously given the employee warnings that her failure to notify her supervisor of her absences would lead to her termination; and the employee failed to comply with the policy on the dates for which she was terminated). Accordingly, FHLB is entitled to summary judgment on Metzler's interference claim despite the fact that it terminated her while she was on FMLA leave.