**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 31, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

BRISTOW ENDEAVOR HEALTHCARE,
LLC,

     Plaintiff - Appellant,

v.

BLUE CROSS AND BLUE SHIELD
ASSOCIATION; HEALTH CARE
SERVICE CORPORATION,

     Defendants - Appellees,

and

AHS HILLCREST HEALTHCARE
SYSTEM, LLC; AHS HILLCREST
MEDICAL CENTER, LLC; AHS
MEDICAL HOLDINGS LLC; ARDENT
HEALTH PARTNERS, LLC; ARDENT
MEDICAL SERVICES, INC.,

     Defendants.

No. 16-5149
(D.C. No. 4:16-CV-00057-CVE-PJC)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **LUCERO**, **McKAY**, and **HARTZ**, Circuit Judges.
_____

     Bristow Endeavor Healthcare, LLC, ("Bristow") appeals a district court order

granting motions to dismiss filed by Blue Cross and Blue Shield Association

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

("BCBSA") and Health Care Service Corporation ("HCSC"). Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I

Bristow is a healthcare company that operates three facilities in northeast Oklahoma: Bristow Medical Center ("BMC"), Cimarron Healthcare Center ("Cimarron"), and the Center for Orthopaedic Reconstruction and Excellence ("CORE"). BCBSA is a federation of independent Blue Cross and Blue Shield companies, including HCSC, which does business as Blue Cross Blue Shield of Oklahoma. Bristow alleges that HCSC exercises market dominance in the northeast Oklahoma market, with at least 64% of the market for health insurers.

BMC is an in-network provider with HCSC. In-network providers receive contractually set payments for healthcare services offered to individuals with HCSC plans. In 2013, Bristow requested that Cimarron be added to the existing in-network provider agreement with BMC. Following negotiations, the parties agreed to add Cimarron and adopt a blended rate for reimbursement payments to both facilities. In March 2014, Bristow and HCSC executed a BlueTraditional Network Participating Hospital Agreement (the "Provider Agreement"), which applied to both BMC and Cimarron. Bristow states that it had an "implicit understanding" that the Provider Agreement would also include all future Bristow entities. However, the Provider Agreement specifically states that additional entities may be added only with the consent of HCSC.

In March 2015, Bristow requested that HCSC add Bristow's new facility, CORE, to the Provider Agreement. HCSC sent Bristow a credentialing application for CORE. After requesting additional information, HCSC informed Bristow that it would not agree to add CORE to the Provider Agreement, but it offered to enter into a separate agreement with the facility. The parties continued discussions through December 2015 but did not reach an agreement.

Bristow alleges that HCSC refused to grant CORE in-network status as a result of a conspiracy to restrain trade with Hillcrest Healthcare System ("Hillcrest") and Ardent Health Services ("Ardent"). Hillcrest operates several healthcare facilities in northeast Oklahoma and is Bristow's largest competitor. Ardent owns Hillcrest. Bristow alleges that Hillcrest and its affiliated companies exercise market dominance in the northeast Oklahoma market. But Bristow merely characterizes Hillcrest's market share as "high" without any particular factual allegations. Bristow also alleges that HCSC reimburses Hillcrest at higher rates than those offered to BMC and Cimarron. It claims that the purpose of the conspiracy is to prevent CORE from fully competing with Hillcrest in the northeast Oklahoma healthcare market, thereby allowing Hillcrest to maintain and expand its market share in that area.

In support of its conspiracy claim, Bristow alleges that representatives of Tulsa Spine & Specialty Hospital ("Tulsa Spine"), a Hillcrest facility, met with representatives of Hillcrest and Ardent on a weekly basis between 2011 and 2015 to "discuss affairs, including CORE." In the summer of 2014, Tulsa Spine hired a private investigator to look into individuals involved in the start-up of CORE.

3

Bristow further alleges, on information and belief, that HCSC participated in some of these meetings and related phone calls, during which it discussed ways to prevent CORE from becoming an in-network provider.

Bristow provides two particular allegations in support of its claim of conspiracy. First, it alleges, on information and belief, that a "representative of Blue Cross Blue Shield"[1] told a Bristow representative CORE was being denied a contract for "CORE's own protection" and that "if Hillcrest tried to open a facility in Bristow, we [Blue Cross Blue Shield] would 'protect you [Bristow].'"[2] Second, Bristow claims that sometime between December 2014 and January 2015, Eddie Gwock, an Ardent representative, told Tulsa Spine that "he could leverage his relationship with Blue Cross Blue Shield to keep CORE out of the network." Gwock "also reported that he spoke with Blue Cross Blue Shield, and in connection with the 'strategic initiative' between Blue Cross Blue Shield, [Ardent, and Hillcrest], Blue Cross Blue Shield would be able to keep CORE out of network."

Bristow filed suit against HCSC, BCBSA, Ardent, Hillcrest, and related entities advancing four claims: (1) violation of § 1 of the Sherman Act, 15 U.S.C § 1; (2) state law conspiracy in violation of Okla. Stat. tit. 79, § 203(A); (3) attempt to monopolize in violation of Okla. Stat. tit. 79, § 203(B); and (4) tortious interference with business relations. The district court granted motions to dismiss

---

[1] In the complaint, Bristow uses "Blue Cross Blue Shield" to refer collectively to HCSC and BCBSA.

[2] BMC is located in Bristow, Oklahoma.

4

filed by HCSC and BCBSA. Bristow then voluntarily dismissed its claims against the remaining defendants with prejudice and filed a timely appeal.

## II

We review a Fed. R. Civ. P. 12(b)(6) dismissal de novo, accepting as true all well-pled factual allegations in the complaint and viewing them in the light most favorable to the plaintiff. Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible if the plaintiff has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint that "tenders naked assertions devoid of further factual enhancement" is insufficient. Id. (quotations and alteration omitted). Further, if a complaint alleges "facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (quotations omitted).

## A

Section 1 of the Sherman Act makes it illegal to engage in a "conspiracy[ ] in restraint of trade or commerce." 15 U.S.C. § 1. The Act "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy." Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 775 (1984). The "crucial question is whether the challenged anticompetitive conduct

5

stems from independent decision or from an agreement, tacit or express." Twombly, 550 U.S. at 553 (quotations and alteration omitted).  To prevail on a § 1 claim, a plaintiff "must include evidence tending to exclude the possibility of independent action." Id. at 554.  A "naked assertion of conspiracy in a § 1 complaint . . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility." Id. at 557.

When a defendant asserts complex claims against multiple defendants, it is "particularly important" to "make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations." Kan. Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1215 (10th Cir. 2011) (emphases omitted).  "The Twombly Court was particularly critical of complaints that mentioned no specific time, place, or person involved in the alleged conspiracies." Robbins v. Okla. ex rel. Dep't of Human Servs., 519 F.3d 1242, 1248 (10th Cir. 2008) (quotation omitted).

Although it is a reasonably close question, we agree with the district court that the complaint does not plausibly allege a conspiracy with respect to HCSC and BCBSA.  An inference of conspiracy is impermissible if the defendants "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations." Matsushita Elec. Indus., Co. v. Zenith Radio Corp., 475 U.S. 574, 596 (1986).  As the district court explained, Hillcrest and Ardent may have been motivated to undermine Bristow as a direct competitor, but HCSC—a purchaser of healthcare services—would be acting directly against its own interest if

6

it agreed to reduce competition in the healthcare provider market, particularly in light of Bristow's allegation that HCSC pays Hillcrest higher reimbursement rates.

The complaint does not advance any reason HCSC would agree to act against its self-interest and it does not identify any benefit that HCSC obtained from Hillcrest or Ardent as part of the alleged conspiracy. A complaint is insufficient if the alleged "behavior was as likely to have been the result of legal, unilateral action as the product of illicit collusion." Kan. Penn Gaming, 656 F.3d at 1214; see also Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984) (noting that a company "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently"). On appeal, Bristow suggests that HCSC acted at the behest of Hillcrest because it needed to maintain Hillcrest's business. But the complaint does not contain any particularized allegations permitting an inference that Hillcrest possessed market power such that it could compel HCSC to act against its own interest. See Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp., 846 F.3d 1297, 1312 (10th Cir. 2017) (a plaintiff can show market power by "pointing to the defendant's share of the relevant market and perhaps barriers to entry" (quotation and alteration omitted)).

Bristow relies heavily on the statements attributed to Gwock. Although those statements make a conspiracy possible, we agree with the district court that they are insufficient. Gwock claimed that he could leverage his relationship with HCSC to keep CORE out of network, and he later reported that CORE would indeed not join the HCSC network. But there are no allegations detailing who Gwock dealt with at

7

HCSC, what was agreed to, or why HCSC agreed to harm itself. In light of HCSC's rational economic motives not to engage in this type of agreement, we think such particularity is necessary. See Matsushita Elec. Indus., 475 U.S. at 596-97.

In addition to Gwock's statement, Bristow highlights the comments of an unidentified representative of either HCSC or BCBSA, who stated that CORE was denied in-network status for its "own protection" and indicated that Bristow would similarly be protected if Hillcrest attempted to open a facility in areas where Bristow operates. Assuming that these statements evince a preference by HCSC to limit its network by geographical sub-regions, it does not suggest coordination between HCSC and Hillcrest. To the contrary, the unidentified representative apparently offered to "protect" Bristow unilaterally, without any proposed agreement with Bristow. If HCSC was willing to take unilateral action to "protect" Bristow, it may well have done so with respect to Hillcrest. See Twombly, 550 U.S. at 554 (a plaintiff "must include evidence tending to exclude the possibility of independent action"). Absent plausible allegations that HCSC or BCBSA conspired to restrain trade, Bristow's § 1 Sherman Act and state law conspiracy claims were properly dismissed.[3]

---

[3] The district court concluded Bristow's state law conspiracy claim failed for the same reasons as its Sherman Act claim. Bristow does not contest that conclusion on appeal. See Green Country Food Mkt., Inc. v. Bottling Grp., LLC, 371 F.3d 1275, 1281 (10th Cir. 2004) ("The Oklahoma Antitrust Reform Act is construed in accordance with federal antitrust law."); see also Okla. Stat. tit. 79, § 212 ("The provisions of this act shall be interpreted in a manner consistent with Federal Antitrust Law 15 U.S.C., Section 1 et seq. . . . .").

**B**

Under Oklahoma law, "[i]t is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce." Okla. Stat. tit. 79, § 203(B). Bristow asserts a claim for attempted monopolization, which requires proof of: "(1) relevant market (including geographic market and relevant product market); (2) dangerous probability of success in monopolizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of such an attempt." TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1025 (10th Cir. 1992).

In its complaint, Bristow alleges that Hillcrest and Ardent, with the assistance of HCSC and BCBSA "are attempting to monopolize or conspiring to monopolize the market for inpatient and outpatient healthcare services in the Northeast Oklahoma/Tulsa area." Bristow cites to the allegation that HCSC has a 64% share of the health insurance market in northeast Oklahoma, but the complaint does not allege attempted monopolization of the health insurance market. Instead, it alleges attempted monopolization of the market to deliver healthcare services to patients. And although the complaint summarily asserts that Hillcrest "exercises market dominance," it does not contain any well-pled allegations to support that assertion. See Iqbal, 556 U.S. at 678 (holding "naked assertions devoid of further factual enhancement" are insufficient (quotations and alteration omitted)). Accordingly the complaint fails to plausibly allege a dangerous probability that the healthcare market in northeast Oklahoma would be monopolized.

9

Bristow also suggests that HCSC, as a purchaser of healthcare services, may be exercising monopsony buying power. But we agree with the district court that this monopsony theory was not fairly pled in the complaint. See Maldonado v. City of Altus, 433 F.3d 1294, 1314 (10th Cir. 2006) (declining to consider a theory that did not appear in the complaint), overruled on other grounds as recognized by Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1171 n.2 (10th Cir. 2006).

## C

Lastly, Bristow appeals the dismissal of its claim for tortious interference with a business relation. To prevail on such a claim, a plaintiff must show: "1) interference with a business or contractual right; 2) malicious and wrongful interference that is neither justified, privileged, nor excusable; and 3) damage proximately sustained as a result of the interference." Tuffy's, Inc. v. City of Okla. City, 212 P.3d 1158, 1165 (Okla. 2009).

The complaint alleges that Bristow, BMC, Cimarron, and CORE "all had business and contractual rights," and that through tortious conduct "described at length therein, the Defendants have interfered with said business and contractual rights." We agree with the district court that this claim presents nothing more than "a formulaic recitation of the elements of a cause of action," which the Court rejected in Iqbal. 556 U.S. at 678. It does not identify what contracts or relationships HCSC or BCBSA might have harmed, and accordingly does not provide those parties with sufficient notice to defend against this claim.

10

## III

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

Entered for the Court


Carlos F. Lucero
Circuit Judge