FILED
United States Court of Appeals
Tenth Circuit

April 6, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

MICHAEL T. SABOURIN,

Plaintiff - Appellant,

v.

UNIVERSITY OF UTAH,

Defendant - Appellee.

No. 10-4150

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:06-CV-01017-TS)**

David J. Holdsworth, Sandy, Utah, for Plaintiff - Appellant.

J. Clifford Peterson, Assistant Utah Attorney General, (Mark L. Shurtleff, Utah Attorney General, with him on the brief), Salt Lake City, Utah, for Defendant - Appellee.

Before **MURPHY**, **HOLLOWAY**, and **HARTZ**, Circuit Judges.

**HARTZ**, Circuit Judge.

Michael T. Sabourin sued the University of Utah in the United States District Court for the District of Utah, claiming, among other things, that it had violated the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601–2654, by

deciding to eliminate his position and then firing him for cause while he was on leave for childcare in June 2006. The district court granted the University summary judgment. Mr. Sabourin appeals the dismissal of his FMLA claims. We have jurisdiction under 28 U.S.C. § 1291 and affirm. All the claims fail because the undisputed facts show that the University's adverse decisions were not based on Mr. Sabourin's taking FMLA leave. The decision to eliminate his position was made before he sought FMLA leave; and he was fired for engaging in a course of insubordination.

## I.     BACKGROUND

### A.     Events Leading to Termination

Mr. Sabourin began his employment with the University of Utah as a contract employee in August 2003. In October 2004 he was switched to full-time status in the University's Department of Environmental Health and Safety (EHS). His position was program manager for emergency preparedness, with responsibilities that included managing grants from the Department of Homeland Security as well as training and educating emergency responders and public-information personnel. His salary and benefits were funded by grants procured by the University.

In April 2006 Mr. Sabourin's supervisor, Marty Shaub, asked the University's internal audit department to review EHS's administrative practices in handling grants. Later that month she received "a draft report that indicated there

-2-

potentially were systematic problems, resulting in mistakes on individual grants."

Supp. App., Vol. 1 at 172 (internal quotation marks omitted). She gave

Mr. Sabourin a copy of the report and asked him to generate a response "as

quickly and as efficiently as possible." *Id.* She met with him and a University

auditor on May 25, about three weeks after he received his assignment; she was

concerned that she still had not received a draft response and that "despite my

efforts to reassure [Mr. Sabourin, he] had grown defensive in his tone when asked

for updates." *Id.* At the meeting Mr. Sabourin presented a spreadsheet on which

he had begun to respond to the auditor's inquiries. According to Ms. Shaub,

Mr. Sabourin agreed that he could complete a draft memorandum within three or

four days. Ms. Shaub said that she and another supervisor "encouraged Mike to

focus less on each individual line item in the beginning and more effort on the

larger questions." *Id.* Mr. Sabourin, however, said that he had received

contradictory instructions from Ms. Shaub and the auditor and that he had

attempted to be "very thorough" in responding to the audit. Aplt. App. at 59.

On May 31 Ms. Shaub sent an e-mail to the University's human resources

department (HRD). The e-mail said that she had attached a memorandum that she

would submit later that day to HRD's manager of employee relations. The

memorandum stated that she intended to "impose a reduction in force" that would

eliminate Mr. Sabourin's position on June 30 because of a depletion in grant

money. *Id.* at 71. It also stated that Ms. Shaub would provide Mr. Sabourin with

-3-

notice four weeks in advance of the position's end date, as required by University policy, and that she understood that Mr. Sabourin would "remain an employee for 30 days from the date of notice." *Id.* HRD responded to the e-mail two days later, indicating that it had not seen the memorandum that Ms. Shaub had promised to send to the employee-relations manager. HRD asked Ms. Shaub to fax a signed copy of the memorandum so that it could begin the reduction-in-force process.

Independent of the arrangements for a reduction in force, on June 5 Mr. Sabourin discussed with Ms. Shaub taking FMLA leave because of childcare needs. He explained that his nanny had quit but that his wife (who also worked for the University) had submitted a shift-change request that would allow them to cover their childcare needs. Ms. Shaub referred him to HRD. According to Mr. Sabourin, she was "obviously annoyed" when he mentioned the possibility of taking FMLA leave and she told him, "Well, what about the internal audit? This is the only thing on the plate right now. We're not working on anything else." *Id.* at 51 (internal quotation marks omitted).

The next day Ms. Shaub informed Mr. Sabourin that she was changing his schedule from Sunday through Thursday to Monday through Friday. According to Mr. Sabourin, he responded that his wife had now changed her schedule and that his childcare needs would be covered so long as his schedule remained what it had been. He states that she responded, "That's not my concern." Supp. App.,

-4-

Vol. 1 at 147 (internal quotation marks omitted).  The reason she gave him for changing his schedule was that Monday through Friday is "when university business takes place."  *Id.* (internal quotation marks omitted).

Mr. Sabourin formally requested FMLA leave on June 6 or 7.  Leave was approved on June 8, to start the following day.  According to the HR representative with whom Mr. Sabourin discussed the leave, he said that "he would be working from home to 'clear his name'" and "had a potential job offer from another employer."  *Id.* at 215.

Ms. Shaub learned on June 8 or 9 that Mr. Sabourin was taking approved FMLA leave.  Mr. Sabourin testified that the day before his leave began Ms. Shaub came to his office and "exploded," "blew up," and went "ballistic" about his leave, saying:  "I'm your supervisor and I have to approve it and I don't think it's important enough for you to leave.  You need to be answering the audit. . . .  You can't take FMLA without me.  Here's the form.  It has a place for my signature and I haven't signed a damn thing."  *Id.* at 163 (internal quotation marks omitted).  It appeared to him that "[s]he felt that I had gone over her head and that's not something you do to [Ms. Shaub]."  *Id.* at 146.

The morning of June 9, Ms. Shaub stopped by Mr. Sabourin's office to look for "files that would allow me to complete the response to the auditor due that day" but found that every drawer had been emptied, that he had not left any copies of the spreadsheet or other paperwork related to the grants or the audit

process, and that he had removed all his electronic files from the University server. *Id.* at 174. Also that morning, Mr. Sabourin had a conversation with an HRD employee about his conflicts with his supervisor; he gave her permission to call Ms. Shaub in an effort to resolve these issues. About 16 minutes after that conversation, Ms. Shaub left a voice-mail message at Mr. Sabourin's home, saying: "I was not aware of your plans to empty out your office" and "I must request that all of those files come back until we have an opportunity to negotiate how duplicates will go home with you." *Id.*, Vol. 2 at 403. Ms. Shaub also discontinued Mr. Sabourin's work cell phone and University e-mail access.

After his confrontation with Ms. Shaub on June 8 or 9, Mr. Sabourin "purposely did not speak with [her] directly" until he had a meeting with her and HRD on June 13. Aplt. App. at 67. At the meeting he returned some paper files, but not the spreadsheet or an after-action report (which summarized and evaluated a mock disaster-relief exercise). He said that he had submitted the after-action report to his instructor for a class at the College of Health and that the spreadsheet was 50% complete and at his home. He agreed to provide the spreadsheet the next day. As the meeting concluded he was given written notice of the reduction in force. The news displeased him. He changed his mind about providing the spreadsheet, saying that he was not required to work because he was on FMLA leave and that he would consult an attorney. And the next day he retrieved his report from the College of Health and took it home.

-6-

Shortly after Mr. Sabourin picked up the after-action report, Ms. Shaub left him a voice-mail message requesting that he "immediately" send her the report and that he provide electronic and hard copies of the spreadsheet "just as soon as you can get them up here." Supp. App., Vol. 2 at 403. The message added, "[I]t was your choice, and it certainly is your right, to not do University business during your leave," but "[w]e just need those files back up here, please." *Id.*

Mr. Sabourin came to the office on June 15 but did not return any documents. Ms. Shaub left him another message that day, saying, "I understand you were in the office today but you did not leave the intra-action report or the spreadsheet." *Id.* She stated in the message that she had "been instructed to request that you get it back here by 10:00 tomorrow morning or we'll file a police report stating that you've got University property without authorization." *Id.* She further stated that she understood that these items were incomplete, but that she wanted them back "[i]n that format" by 10 a.m. *Id.* An HRD employee also left Mr. Sabourin two messages that day, warning that the University would file criminal charges if the property was not returned. Finally, a letter from Ms. Shaub dated June 15 notified Mr. Sabourin of a predisciplinary conference to address Mr. Sabourin's alleged delay and obstruction in returning University work and property. It expressed her "intent to terminate your employment for failing to return University files you removed from your office . . . and for deleting your electronic files." *Id.*, Vol. 1 at 222. The letter set the conference

for June 22 and advised Mr. Sabourin of his opportunity to respond to the allegations. According to Ms. Shaub, on June 16 Mr. Sabourin "was again on campus but did not return the U of U documents repeatedly demanded of him." *Id.* at 176. In a June 19 conference call, however, Mr. Sabourin agreed to turn in his work cell phone, laptop, and the spreadsheet.

Mr. Sabourin, Ms. Shaub, and an HRD employee attended the predisciplinary conference on June 22. Mr. Sabourin returned the laptop. But he had erased all the contents except for the spreadsheet and an operating system; and the spreadsheet could not be opened because the application used to create it had been deleted. When asked about the other files, Mr. Sabourin said that he was not required to return them and that "everything was in your email." *Id.* at 268 (internal quotation marks omitted). At his deposition in this case, Mr. Sabourin clarified this statement, explaining that some deleted programs were personal and any deleted work-related files were stored on his group-wise e-mail. Mr. Sabourin also testified that when Ms. Shaub had said in a prior meeting that she wanted the laptop returned, she had requested only two files on it—the spreadsheet and the after-action report.

The University's general counsel's office sent Mr. Sabourin's attorney a letter on June 30, stating that it had been the University's "understanding that Mr. Sabourin would be removing his personal information from the University's lap top computer and transferring to that computer all of the work-related

-8-

electronic data that Mr. Sabourin had stored on his personal computer and storage devices," but that he instead had "apparently wiped the University's lap top computer clean of all documents and programs" and then loaded the spreadsheet back onto the computer. *Id.* at 228. It claimed that he "did not leave . . . any of the data to which the spreadsheet was supposed to link" and "failed to transfer to the laptop any other work documents that were contained on his personal computer and data storage devices." *Id.* The letter concluded that Mr. Sabourin's actions were not in keeping with the agreement reached at the telephone conference and requested that he "immediately . . . return to the University all electronic data in his possession that relates to his work at the University of Utah." *Id.* In addition, the letter stated that the department was missing "a number of items that were purchased on the grant[,] . . . including some electronic equipment and various software packages," and that the University suspected that Mr. Sabourin had "many of these items." *Id.* at 229. It requested that Mr. Sabourin return these and any other items belonging to the University.

Ms. Shaub also sent Mr. Sabourin a letter dated June 30, which informed him that, with the concurrence of her supervisor, she had decided to terminate his employment. The letter listed a number of reasons for the termination, including his removing all the files from his office without informing her or leaving an inventory of what had been removed, failing to return her June 9 message requesting that the files be sent to her, failing to return the spreadsheet and the

-9-

after-action report in a timely manner after being instructed to do so at the June 13 meeting, deleting all his electronic records from the University server, and deleting files and supporting software from his work laptop before he returned it. The letter also asserted that the University could suffer a loss of more than \$350,000 from Mr. Sabourin's actions in obstructing the audit and that it was still uncertain whether he had returned all the necessary files. In addition to announcing his termination, the letter stated "that the University has decided to designate you as ineligible for employment or volunteer opportunities for a minimum of five (5) years." *Id.* at 268. The letter advised Mr. Sabourin that he had a right to appeal his termination and five-year hiring ban and to seek redress if illegal discrimination had taken place.

## B. Posttermination Events

On July 8 Mr. Sabourin submitted his statement of appeal challenging his termination and the five-year hiring ban. It asserted that "[t]he decision to terminate my employment was clearly an act of retaliation by my immediate supervisor, Marty Shaub, because I sought to address, through the Human Resources Department, interpersonal difficulties that were continually occurring with her." *Id.* at 280. It gave a detailed account of Mr. Sabourin's conflicts with Ms. Shaub dating back to December 2005, complained that his office was ransacked and his personal items moved, and accused Ms. Shaub of leaving threatening voice-mail messages. It claimed that the delay in returning files was

partly "because Ms. Shaub's requests were unclear," *id.* at 286; that he deleted files from the University server because he had been instructed to eliminate unnecessary files and those files would still be accessible through his e-mail; that Ms. Shaub's termination of his e-mail access had prevented him from retrieving the files and returning them to the University; that he had offered to search for items if the University provided him with a list; that he had found and would return some missing property on a list that the University had given him; that "Ms. Shaub and Ms. Sorenson [were] already aware they have in their possession" some outstanding items, *id.* at 287; that any programs removed from his work laptop were purchased by him; and that the claim that $350,000 in grant money might have to be refunded was erroneous and exaggerated.

A September 15 report of the University grievance committee said that "Mr. Sabourin did not provide evidence showing that it is 'more probable than not'" that the University had violated its procedures. *Id.* at 272. It found "that Mr. Sabourin 1) did not complete [the spreadsheet and after-action] reports, or return any accessible partial reports, 2) did not return all grant-related property prior to his termination, and 3) deleted all electronic files from the [department's shared] drive." *Id.* It concluded, "Ms. Shaub's decision to terminate Mr. Sabourin is deemed as appropriate and reasonable by the Committee," *id.* at 273, and recommended that the termination and five-year hiring ban be upheld.

The vice president of the University ratified the report's "findings, conclusions, and recommendations" on September 19, 2006. *Id.* at 275.

### C. Litigation

On December 8, 2006, Mr. Sabourin filed suit against the University. The first amended complaint alleged (1) that the University had violated the FMLA by eliminating his position and terminating his employment; (2) that it had breached his employment contract; (3) that it had wrongfully terminated his employment for whistle blowing; and (4) that it had deprived him of liberty and property without due process. On June 14, 2010, the University filed a motion for summary judgment requesting dismissal of all claims. The district court granted the motion on July 22. *Sabourin v. Univ. of Utah*, No. 2:06-CV-1017 TS, 2010 WL 2901614 (D. Utah July 22, 2010). On appeal Mr. Sabourin pursues only his FMLA claims.

## II. DISCUSSION

### A. Standard of Review

"We review the district court's grant of summary judgment de novo, applying the same standards that the district court should have applied." *Merrifield v. Board of Cnty. Comm'rs*, 654 F.3d 1073, 1077 (10th Cir. 2011) (internal quotation marks omitted). "Summary judgment 'should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)(2)). We evaluate the evidence "in the light most favorable to the non-moving party." *Id.* (internal quotation marks omitted).

**B.     Claims**

The FMLA provides that an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). It also forbids an employer "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." *Id.* § 2615(a)(2). Mr. Sabourin appeals the dismissal of his four FMLA claims, two for interference under § 2615(a)(1) and two for retaliation under § 2615(a)(2). He contends that there was sufficient evidence to support his allegations that the elimination of his position as a reduction in force constituted both (1) interference and (2) retaliation, and that his termination also constituted (3) interference and (4) retaliation.

To establish an interference claim, Mr. Sabourin must show "(1) that he . . . was entitled to FMLA leave, (2) that some adverse action by the employer interfered with his . . . right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights." *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006) (internal quotation marks omitted). Even if Mr. Sabourin shows these elements, the University will still prevail if it shows that he "would have been dismissed

-13-

regardless of [his] request for, or taking of, FMLA leave." *Id.* (internal quotation marks omitted).

As for retaliation claims, we review them at the summary-judgment stage under the burden-shifting framework for employment-discrimination claims that originated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a prima facie case of retaliation, Mr. Sabourin must prove that "(1) [he] engaged in a protected activity; (2) [the University] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action." *Metzler*, 464 F.3d at 1171 (footnote omitted). If he establishes a prima facie case, the University must then produce a "legitimate, nonretaliatory reason for its termination decision." *Id.* at 1172. If the University produces such a reason, the burden shifts back to Mr. Sabourin to "show that there is a genuine dispute of material fact as to whether [the University]'s explanations for terminating [his] employment are pretextual." *Id.*

In its motion for summary judgment the University conceded most elements of Mr. Sabourin's FMLA claims and challenged only his assertions regarding its reasons for the reduction in force and the termination. We first address the reduction-in-force claims and then turn to the termination claims.

### 1. Reduction-in-Force Claims

While Mr. Sabourin was on FMLA leave, he was informed that his position was being eliminated in a reduction in force because of inadequate funds. He contends that there were ample funds to support his position and that the true reason for the reduction in force was Ms. Shaub's outrage at his going over her head to obtain FMLA leave.

The flaw in Mr. Sabourin's reasoning is that the uncontradicted evidence shows that Ms. Shaub decided to lay off Mr. Sabourin *before* she learned that he might take FMLA leave. There is no dispute that Ms. Shaub submitted a request to eliminate his position on May 31, 2006, yet she did not learn that he was seeking FMLA leave until June 5. Perhaps there was enough money to continue Mr. Sabourin's position and perhaps Ms. Shaub knew that; but even if Ms. Shaub's stated reason was pretextual, the true reason could not have been the later request for FMLA leave. (We note that Mr. Sabourin's July 8 statement appealing his termination recited his interpersonal conflicts with Ms. Shaub dating back to December 2005.)

Mr. Sabourin argues that although Ms. Shaub "contemplated imposing a reduction in force . . . , [she] hadn't yet decided to implement such a reduction in force or to notify Mr. Sabourin that she was going to go ahead and actually implement the reduction in force until after he started taking FMLA leave." Aplt. Br. at 19. He contends that "[j]ust because Ms. Shaub had gone through the necessary steps to obtain approval to impose a reduction in force, such does not

-15-

mean she had decided to go ahead and implement such reduction of force or that she had to go ahead with her plan." *Id.* at 23.

But contrary to Mr. Sabourin's theory, Ms. Shaub's May 31 letter is unequivocal that the reduction-in-force decision had already been made. It begins, "The purpose of this memorandum is to inform you of my intent to impose a reduction of force within EHS." It later states: "I intend to eliminate the position of Program Manager," "The employee to be affected by this action is Mike Sabourin," and "I plan to eliminate the position(s) effective June 30, 2006." Supp. App., Vol. 1 at 208.

Mr. Sabourin suggests that Ms. Shaub's decision must have still been tentative on May 31, because (1) she planned to eliminate the position as of June 30; (2) she knew, as stated in the May 31 letter, that she needed to give him four weeks' notice, so notice would need to be provided by June 2; but (3) she failed to give notice until June 13, after he began his FMLA leave. Mr. Sabourin fails, however, to provide evidence of any hesitation or reconsideration by Ms. Shaub. On the contrary, the only relevant evidence in the record suggests that the delay in giving notice resulted from bureaucratic causes. The May 31 letter concluded: "I am coordinating this action through Diane Nelson, HR Generalist." *Id.* Ms. Shaub explained in an affidavit that she had "asked for assistance from HR to understand the Reduction in Force rules and procedures." Aplt. App. at 134. On June 2 Ms. Nelson sent Ms. Shaub an e-mail saying that

-16-

she had not yet seen the letter that Ms. Shaub had sent over, but that once

Ms. Shaub faxed her a signed copy, "Employee Relations can start the process."

Supp. App., Vol. 1 at 209. There is no evidence of further involvement in "the

process" by Ms. Shaub before notice was given to Mr. Sabourin on June 13.

Thus, there is no genuine issue that the reduction in force was wholly

independent of Mr. Sabourin's request for FMLA leave. His interference claim

fails because the reduction in force was not "related to the exercise or attempted

exercise of his FMLA rights." *Metzler*, 464 F.3d at 1180 (internal quotation

marks omitted); *see Taylor v. Smith's Food & Drug Ctrs., Inc.*, 127 F. App'x 394,

397 (10th Cir. 2005) (employer's decision to terminate plaintiff was unrelated to

the plaintiff's FMLA request because it would have terminated plaintiff anyway;

it "had already *begun* to process [plaintiff]'s termination two days prior to her

request for the FMLA forms" (emphasis added)).

Likewise, the reduction in force cannot support an FMLA retaliation claim

because there is no genuine issue that there was no "causal connection between

the protected activity [the request for FMLA leave] and the adverse action [the

reduction in force]." *Metzler*, 464 F.3d at 1171.

### 2. Termination Claims

Mr. Sabourin claims that the University interfered with his FMLA leave

and retaliated against him for taking FMLA leave by converting the reduction in

force into a termination for cause. The factual basis for Mr. Sabourin's claim

consists essentially of (1) the temporal coincidence of his firing and his FMLA leave; (2) the extreme anger displayed by the person who initiated the firing, Ms. Shaub, when he informed her of his leave; and (3) Ms. Shaub's imposing work duties on him while he was on FMLA leave and then justifying his firing on the ground that he had failed to perform those duties. We agree that temporal proximity, expressions of anger in response to protected activity, and the improper imposition of work duties on one taking FMLA leave could all be persuasive evidence in support of claims like Mr. Sabourin's. But these circumstances must be viewed in context. And in the context of the undisputed evidence in this case, there is no genuine issue that Mr. Sabourin's claim is unsupported.

To begin with, although Mr. Sabourin testified in his deposition that Ms. Shaub "exploded" when she learned of his FMLA leave, Supp. App., Vol. 1 at 163, he explained that she reacted in that way because "[s]he felt that I had gone over her head and that's not something you do to [her]," *id.* at 146. Ms. Shaub's initial reaction certainly has some probative value, but not a great deal.

More importantly, the decision to fire Mr. Sabourin is supported by extensive undisputed evidence of his efforts to impede and obstruct efforts by his employer to perform his job in his absence. When he left on FMLA leave, he removed all tangible files from his office, removed all his electronic files from

the University server, and kept the laptop on which he maintained files electronically. When this was discovered on the morning of his first day of leave, June 9, Ms. Shaub left him a voice-mail message at home "request[ing] all of those files come back until we have an opportunity to negotiate how duplicates will go home with you." *Id.*, Vol. 2 at 403. Mr. Sabourin did not respond until a meeting with Ms. Shaub on June 13. At that time he returned some paper files but not an after-action report or the spreadsheet with his preliminary responses to the auditor report.

It is Mr. Sabourin's responses to the requests for those two documents that unequivocally demonstrated his insubordination. At the June 13 meeting he originally stated (1) that the after-action report was in the hands of an instructor to whom he had submitted the report for a class he was taking and (2) he would provide the spreadsheet the next day. But after being informed of the reduction in force, he changed his mind. Certainly he could properly be upset upon hearing the news that he would be losing his job. If, however, he chooses to react by being an obstructive, rather than a faithful, employee, he cannot expect to retain his position, even until the reduction in force takes effect. And Mr. Sabourin's reaction cannot be characterized as anything but obstructive.

First, rather than being passive and allowing his employer to pick up the after-action report from the instructor, Mr. Sabourin preempted his employer by retrieving the report from the instructor on June 14 and taking it home. As for the

spreadsheet, his response to the reduction-in-force notification was to tell Ms. Shaub that he had changed his mind about providing it the next day because he was not required to work while on FMLA leave. On June 14, Ms. Shaub left him a voice-mail message at home, saying that "it was your choice, and it certainly is your right, to not do University business during your leave," but that "[w]e just need those files back up here, please." *Id.* He came to his office on June 15 but returned no documents. Upon hearing of this, Ms. Shaub left a stronger message that day, warning that a police report would be filed if he did not bring the spreadsheet (and the after-action report) by the next morning. Only on June 19 did Mr. Sabourin agree to return his laptop and the spreadsheet. But he did not return the laptop until June 22, and even then everything had been erased from it except for the spreadsheet and the operating system, and the spreadsheet could not be opened because the application used to create it had been deleted. Additional undisputed facts recited earlier in this opinion further establish Mr. Sabourin's disloyalty and vindictiveness, but what has been said here will suffice.

Reviewing the evidence presented by Mr. Sabourin, we see no improper imposition of work duties on him during his FMLA leave. The requests by Ms. Shaub were for items necessary for his employer to perform his work while he was absent. There will undoubtedly be occasions when an employee on FMLA leave cannot respond to any request by the employer, or the request may simply

be unreasonably burdensome. But this was not such an occasion. If Mr. Sabourin had done nothing, his employer would have retrieved the after-action report from the instructor, but Mr. Sabourin went out of his way to keep that from happening by preemptively retrieving the report to take home. And the spreadsheet could easily have been provided with the laptop on occasions when Mr. Sabourin went to the campus without returning anything. Indeed, he again went out of his way to impede his employer's access to the spreadsheet by erasing the application from the laptop. It is also worth noting that the records sought by the University were removed by Mr. Sabourin from his office when he took FMLA leave; they were not records ordinarily maintained only at his home. In short, the University's request for materials from Mr. Sabourin was not an impermissible demand for work during FMLA leave. It was a request for a modest, unburdensome effort to enable Mr. Sabourin's work to be performed while he was on leave. *See Daughtery v. Wabash Ctr., Inc.*, 577 F.3d 747, 751 (7th Cir. 2009) (employer's requests for keys and passwords were modest and would enable employer to operate without the employee).

We can summarize as follows: The University states that it fired Mr. Sabourin for his disloyal and obstructive conduct *while on* FMLA leave, not *because* he requested or took FMLA leave; the undisputed evidence fully supports that explanation; and Mr. Sabourin has provided no evidence to show that the explanation is pretextual. Under our precedents, summary judgment on

Mr. Sabourin's retaliation claim was therefore required. He had the burden to "show that there is a genuine dispute of material fact as to whether [the University's] explanations for terminating [his] employment are pretextual." *Metzler*, 464 F.3d at 1172. He failed to satisfy that burden and therefore succumbs to summary judgment on the claim.

Our analysis of Mr. Sabourin's interference claim is on its face somewhat different, but in substance it is the same. Under this circuit's somewhat inconsistent precedents, the summary-judgment analyses of FMLA retaliation and interference claims differ in their consideration of an employer's contention that the employee was fired for reasons wholly independent of his request for or taking of FMLA leave. For an FMLA retaliation claim, although we grant summary judgment only when a jury could not reasonably decide otherwise, *see Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1216 (10th Cir. 2007), and even though a jury is not to be instructed on the *McDonnell Douglas* framework, *see U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 713–16 (1983); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000); *cf. Wells v. Colo. Dept. of Transp.*, 325 F.3d 1205, 1227 (10th Cir. 2003) (Hartz, J., concurring), we use the burden-shifting rules of that framework in assessing whether to affirm summary judgment. *See Metzler*, 464 F.3d at 1170. In other words, all the employer need do is assert a nonretaliatory motive, and the employee must then provide evidence showing that the asserted motive is

-22-

pretextual. *See id.* On the other hand, when an employer defends an FMLA interference claim on the ground that it would have terminated the employee anyway, we place the burden of persuasion on the employer to prove that defense. *See id.* at 1180. This disparate assignment of the burden of persuasion could well result on occasion in granting or affirming summary judgment to an employer on a retaliation claim but not on an equivalent interference claim. On some future occasion this court may wish to justify these contrasting standards of review or alter one of them. But we need not do so here. The University has satisfied its burden under an interference claim as well as under a retaliation claim. It has not merely *asserted* its reason for its decision to fire Mr. Sabourin. It has produced a sufficient body of undisputed evidence that a reasonable juror could not find another reason.

## III. CONCLUSION

We AFFIRM the district court's grant of summary judgment.