

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-25-00377-CV

JENNIFER NELSEN AND TERRI STEIGLEDER, AS HEIRS TO THE ESTATE
OF JON TILLMAN MILSTEAD, DECEASED, APPELLANTS

V.

DENTON COUNTY, TEXAS, DENTON COUNTY SHERIFF'S OFFICE, AND TRACY
MURPHREE, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY, APPELLEES

On Appeal from the 477th District Court
Denton County, Texas[1]
Trial Court No. 22-2726-211, Honorable Michael Dickens, Presiding

June 11, 2026

MEMORANDUM OPINION

Before PARKER, C.J., and YARBROUGH and PRATT, JJ.

Appellants, Jennifer Nelsen and Terri Steigleder, heirs to the estate of Jon Tillman
Milstead ("Milstead"), appeal from the trial court's ordering granting summary judgment in
favor of Appellees, Denton County, Texas, Denton County Sheriff's Office, and Tracy

---

[1] Because this matter was transferred from the Second Court of Appeals, we apply its precedent
when it conflicts with that of the Seventh Court of Appeals. TEX. R. APP. P. 41.3.

Murphree ("Denton County").  Milstead challenges the court's order through four issues.  We affirm.

## BACKGROUND

Jon Milstead suffered from chronic migraines beginning in 2002.  He lost his sister in 2008.  He married his wife in 2016.  His wife had a brain tumor and passed not long after she and Milstead married.  A year later, his mother-in-law died from the same cancer suffered by his wife.  Milstead was diagnosed with depression and post-traumatic stress disorder following those events.

Milstead's law enforcement career began when he started working as a jail detention officer in 2014.  He obtained his peace officer license in 2017 and began field officer training in 2018 with the Denton County Sheriff's Office.  Milstead took FMLA leave from July 17, 2018 through August 3, 2018, for medical issues.  Not long into his training, Milstead moved laterally from Deputy Patrol to Background Investigator of the Denton County Sheriff's Office, effective December 1, 2018.

In 2019, Milstead was promoted to Investigator-Professional Standards Unit in the Sheriff's Support Services Division.   In this position, Milstead was responsible for conducting background investigations for both internal and external job applicants.  His supervisor, Captain Kelly Fair, favorably evaluated Milstead, noting he was "quick to learn" the position, wrote his reports well such that they were rarely returned, and was a "true team player."  Kelly even recommended that Milstead pursue his college degree to benefit his growth with the department.

In early September 2020, Milstead talked to Sergeant Jimmy Lewis and Captain Fair about his migraines and depression. He indicated he planned to seek help from his doctor. A few weeks later, on September 23, 2020, Milstead told Fair and Lewis that his doctor was recommending he take time off work. Fair provided him the necessary paperwork, including a document requiring that Milstead and his doctor provide a description of the relevant medical facts, an estimated treatment schedule, and an estimate of the period of leave needed (Certification of Health Care Provider for Employee's Serious Health Condition).

Milstead completed his paperwork and took time off from September 24 to October 5, 2020. He returned to work in early October. He took emergency sick leave from October 21 through October 27, 2020. On November 10, while Milstead was driving to a doctor's appointment, he called Lewis about getting help. Later that day, Milstead told Lewis he would be in the hospital for inpatient care. Fair filled out a notification for Milstead with an "unknown" anticipated return date.

On November 16, Milstead returned the FMLA certification form to the department for his leave, indicating leave was necessary for "major depressive disorder, recurrent, severe, without psychotic features." His doctor stated the condition would cause "episodic flare-ups" that would periodically prevent Milstead from performing his job functions. The doctor recommended that Milstead participate in a partial hospitalization program for about two weeks. This leave was approved, with an anticipated date to return to work at the end of November 2020.

3

On November 23, 2020, Milstead's physician sent Denton County a new FMLA certification, extending the estimated FMLA leave through February 19, 2021. This leave was apparently necessary to attend medication and therapy appointments twice per week as part of an intensive outpatient program. The doctor noted that Milstead's symptoms of depression were interfering with his ability to perform daily living tasks. The FMLA leave was approved with the notation that Milstead would exhaust all of his FMLA leave hours on February 15, 2021. On December 23, 2020, Milstead successfully completed the intensive outpatient program, and he was released to work without restrictions on December 28, 2020, in advance of the expiration of his FMLA hours.

However, Milstead did not return to work until January 7, 2021, due to exposure to COVID-19. Denton County designated Milstead's leave due to COVID-19 as FMLA leave, not FFCRA (Families First Coronavirus Response Act) or sick leave under Denton County's sick leave pool policy.[2] As a result, Milstead was not paid since the FMLA leave was unpaid.

On November 5, 2020, not long after Milstead's first FMLA leave, Lewis alleged that Milstead interfered in Milstead's father's background investigation. He gave Milstead a verbal warning and told him to refrain from interfering in investigations in which he had a personal interest so that the investigator could complete the investigation without input or personal bias. When Milstead returned to work on January 7, 2021, he learned his father's employment with the sheriff's office had been denied. He made some inquiries

---

[2] Tony Luton, the new Assistant Director of Human Resources, concluded that Milstead's major depressive disorder did not meet the definition of "catastrophic illness" and therefore, determined Milstead did not qualify for leave under the sick leave pool policy. Denton County denied Milstead's request to be paid from December 3 to December 23, 2020.

4

concerning the denial. On January 22, 2021, Fair placed Milstead on an Internal Affairs investigation, alleging seven policy violations related to Milstead's queries concerning his father's employment. Fair administered a warning to him and placed him on indefinite administrative leave. Milstead contacted a medical provider, indicating that the administrative leave situation was causing him stress and confusion and his migraines had returned. The doctor recommended he follow his medication routine and follow up in two months.

In February 2021, Denton County notified Milstead that he needed to perform a fitness-for-duty evaluation. Fair requested the evaluation based on her observations of Milstead's appearance, work performance, anger issues, and general unusual behavior. Milstead attended the required psychological evaluation on March 29, 2021, while he was on paid administrative leave. The administrator of the test found Milstead's mental status was in the normal range. His aggression scores were within normal limits, and he was comfortable in social situations; he was friendly and extroverted. Milstead tested low on the suicidal behaviors test. Milstead did tell the administrator he had been feeling depressed and uninterested, and had difficulty sleeping, lack of appetite, concentration difficulties, and lack of energy. When she asked whether Milstead would like to return that day, he said his energy level was so low that he did not feel he would be able to work at that time. But, he said he felt he would be able to return to work in a couple of weeks. The administrator and Milstead discussed the possibility of Milstead spending that time obtaining more counseling and maybe altering his medications.

The administrator said in her report that Milstead was unfit for duty at that time due to lack of concentration, slow movements, and lack of energy. She provided four

recommendations for Milstead to become fit for duty and sent the report to Denton County by email. On April 9, 2021, several members of Denton County met to discuss Milstead's evaluation. At that time, Milstead had not been informed of the information in the report, nor does it appear that the persons in the meeting were informed of the administrator's recommendations for Milstead to be able to return to duty. Krystal Amyx, the Civil Service Manager for Denton County, told Tracy Murphree, Denton County Sheriff, he could terminate Milstead's employment. He did so.

A few days later, Milstead asked Amyx why he was being terminated and explained he could return to his job soon. No accommodation was offered. Following his termination, Milstead worked as a courtesy officer at his apartment complex and his doctor reported he was functioning well and seeking additional employment. Milstead went on to assist a friend in remodeling homes and also waited tables at a local restaurant. He was promoted but did not have affordable health insurance and did not continue seeing mental health professionals. He passed away on January 7, 2025, at forty years of age.

## ANALYSIS

By this appeal, Milstead challenges the trial court's granting of Denton County's motion for summary judgment. He contends there was ample evidence that Denton County violated the American with Disabilities Act (ADA), the Texas Commission on Human Rights Act (TCHRA), and the Family and Medical Leave Act (FMLA). He claims Denton County's own records show it was aware of Milstead's disabilities and his need for brief additional leave. However, he posits, instead of engaging in the interactive

6

process and granting a simple accommodation, Denton County "pushed [him] out the door, leaving him stranded and without insurance to afford his mental health professionals . . .." Therefore, he contends, summary judgment was improper because the evidence shows Denton County discriminated against him because of his disabilities, refused to provide minimal accommodation, even though he was already on leave, retaliated against him for exercising his rights, and interfered with his FMLA rights.

Standard of Review

We review summary judgments de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When, as here, a party moves for both traditional and no-evidence summary judgment, we first review the trial court's ruling under the no-evidence standard. *Dillard v. SNC-Lavalin Eng'rs & Constructors, Inc.*, 629 S.W.3d 692, 696-98 (Tex. App.—Houston [1st Dist.] 2021, pet. denied).

Following adequate time for discovery, a party may move for summary judgment on the basis that there is no evidence to support one or more essential elements of the nonmovant's claim. TEX. R. CIV. P. 166a(i). The trial court must grant no-evidence summary judgment unless the nonmovant responds by producing competent summary-judgment evidence raising a genuine issue of material fact as to each challenged element. TEX. R. CIV. P. 166a(i); *Dillard*, 629 S.W.3d at 696.

The standard of review mirrors legal-sufficiency review. *Id.* Therefore, we will affirm a no-evidence summary judgment when there is a complete absence of evidence of a vital fact, the court is barred by rules of law or evidence from giving weight to the sole evidence offered to prove a vital fact, the evidence offered to prove a vital fact is no more

7

than a mere scintilla, or the evidence conclusively shows the opposite of a vital fact. *Id.* We consider the evidence in the light most favorable to the nonmovant. *Id.*

To obtain traditional summary judgment, a party must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). If the movant does so, then the burden shifts to the nonmovant to raise a genuine issue of material fact. *Id.* at 696-97.

Applicable Law

ADA and TCHRA

The TCHRA is modeled after the ADA and both prohibit employment discrimination on the basis of disability. *Hoffmann–La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445–46 (Tex. 2004). Under the TCHRA, "disability" means "a mental or physical impairment that substantially limits at least one major life activity" or "a record of such an impairment" or "being regarded as having such an impairment." TEX. LABOR CODE § 21.051. This includes an impairment that is episodic in nature but "substantially limits a major life activity when active." *Id.*

Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." TEX. LABOR CODE § 21.002(11-a). In deciding whether an impairment substantially limits a major life activity, we must do so "without regard to the ameliorative effects of mitigating measures," including medication. TEX. LABOR CODE § 21.0021(b). Appellate courts are required to construe the term disability "in favor of broad coverage of individuals" in employment-

8

discrimination suits "to the maximum extent allowed" by the applicable statutory provisions.  TEX. LABOR CODE § 21.0021(a)(1).

It is unlawful for an employer subject to the anti-discrimination provisions of the TCHRA "to fail or refuse to make a reasonable workplace accommodation to a known physical or mental limitation of an otherwise qualified" employee with a disability, unless the employer "demonstrates that the accommodation would impose an undue hardship on the operation of the business."  TEX. LABOR CODE § 21.128(a).

To prevail on a claim that an employer failed or refused to make a reasonable accommodation, an employee-plaintiff must prove that: (1) he has a disability as that term is statutorily defined; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation he could perform his job's essential functions; and (4) his employer failed or refused to make such an accommodation.  *Donaldson v. Tex. Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 439 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

Lastly, in applying the anti-discrimination provisions of the TCHRA, we are mindful that one of the purposes is to implement the policies embodied in Title I of the Americans with Disabilities Act and its amendments, which address employment discrimination.  TEX. LABOR CODE § 21.001(3).  Accordingly, federal decisions interpreting the ADA may guide our interpretation of the TCHRA.  *Dillard*, 629 S.W.3d at 698 (citing *Primeaux v. Conoco, Inc.*, 961 S.W.2d 401, 403 n.2 (Tex. App.—Houston [1st Dist.] 1997, no writ)).

<u>FMLA</u>

FMLA allows eligible employees working for covered employers to take temporary leave without the risk of losing employment because of, among other things, a serious health condition that makes the employee unable to perform the functions of the employee's position. 29 U.S.C. § 2612(a)(1)(D). Section 2612 of the FMLA also sets forth the requirements necessary for an employee to take leave under the act. *Id.* Generally, an eligible employee is entitled to a total of 12 workweeks of leave during any 12-month period because of a serious health condition that makes the employee unable to perform the functions of the position of such employee. 29 U.S.C. § 2612(a).

When an eligible employee returns from leave taken under FMLA, the employer must restore the employee to the same position or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. *See* 29 U.S.C. § 2614(a)(1). FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). An employer who engages in such unlawful conduct is liable to any eligible employee for certain losses incurred by such employee as a result of the unlawful conduct. 29 U.S.C. § 2617(a)(1)(A)(i).

Employers are also prohibited from retaliating against an employee for utilizing FMLA. Appellate courts apply the *McDonnell Douglas* burden-shifting framework to retaliation claims brought under the FMLA. *Horelica v. Fiserv Solutions, Inc.*, 123 S.W.3d 492, 495 (Tex. App.—San Antonio 2003, no pet.) (citing *Hunt v. Rapides Healthcare System*, *LLC*, 277 F.3d 757, 768 (5th Cir. 2001); *Sibley v. Kaiser Foundation Health Plan*

*of Texas*, 998 S.W.2d 399, 402 (Tex. App.—Texarkana 1999, no pet.)).  To make a prima facie showing of retaliation under the FMLA, a plaintiff must show: (1) he was protected under the FMLA; (2) he suffered an adverse employment decision; and either (3) he was treated less favorably than an employee who had not requested leave under the FMLA or the adverse decision was made because he took FMLA leave.  *Horelica*, 123 S.W.3d at 495.

If a plaintiff succeeds in making a prima facie case, the burden of production, rather than persuasion, shifts to the defendant to articulate a legitimate nondiscriminatory or nonretaliatory reason for its employment action.  *Id.*  If the defendant meets its burden, the plaintiff must show by a preponderance of the evidence that the defendant's reason is a pretext for retaliation.  *Id.*

Application

Issue One—Disability Discrimination Claim

By his first issue, Milstead argues the trial court erred in granting summary judgment on the ADA/TCHRA disability discrimination claim because the evidence raised genuine issues of material fact on disability, qualification, adverse action, and pretext/causation.  We resolve the issue against Milstead.

Denton County claims Milstead was not, as a matter of law, a qualified individual under the TCHRA and the ADA; therefore, his claims fail.

To establish a prima facie case of discrimination, Milstead was required to prove that (1) he has a disability, (2) he is a qualified individual, and (3) he was subjected to

11

unlawful discrimination because of his disability. *Davis v. City of Grapevine*, 188 S.W.3d 748, 757 (Tex. App.—Fort Worth 2006, pet denied). Therefore, one claiming an employer failed to provide reasonable accommodations, or otherwise discriminated against him based upon a disability, must show that: (1) with reasonable accommodations he could perform the essential functions of the position and (2) the employer refused to make such accommodations. *Bratu v. Tex. DMV*, No. 07-24-00034-CV, 2024 Tex. App. LEXIS 4585, at *4 (Tex. App.—Amarillo June 28, 2024, no pet.) (mem. op.).

The term "qualified individual with disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions" of his employment position. 42 U.S.C. § 12111(8). Similarly, under the TCHRA, employers can only be held liable for discrimination "because of or on the basis of a physical or mental condition that does not impair an individual's ability to reasonably perform a job." TEX. LAB. CODE § 21.105. In discrimination cases under both the TCHRA and ADA, the plaintiff bears the burden of showing he is "otherwise qualified" or can "reasonably perform a job." The employee can establish this in either of two ways: (1) by proving that he can perform all essential job functions without modifications or accommodations, or (2) that some reasonable accommodation by the employer would enable him to perform the job.

Milstead was employed by Denton County as a Background Investigator. He was a licensed police officer who carried a firearm. One of the express conditions of Milstead's licensure as a police officer was that he be psychologically fit. *See* TEX. OCC. CODE § 1701.306(a)(1) (providing that a commission may not issue a license to a person unless the person is examined by "a licensed psychologist or by a psychiatrist who declares in

12

writing that the person is in satisfactory psychological and emotional health to serve as the type of officer for which a license is sought"). *See also* TEX. ADMIN. CODE § 217.1(b)(12) (the "individual must be declared by that professional, on a form prescribed by the commission, to be in satisfactory psychological and emotional health to serve as the type of officer for which the license is sought"); 37 TEX. ADMIN. CODE § 211.29(g) (an agency chief administrator has an "obligation to determine that all appointees are able to safely and effectively perform the essential job functions" and "may require a fit for duty review upon identifying factors that indicate an appointee may no longer be able to perform job-related functions safely and effectively"). Further, as noted under the required knowledge, skills, and abilities section in the job description for Milstead's specific position with Denton County, Milstead was required to be able to perform under stress in emergency situations, exercise sound judgment in emergency situations, and adopt quick, effective, and reasonable courses of action.

Fair (Milstead's Captain/supervisor) made several observations of Milstead. She noted: (1) periods of extreme weight loss, (2) disheveled and unkempt appearance, (3) puffy and dark eyes, (4) picking at sores on his scalp, (5) office chat that seemed to border on paranoia, (6) inappropriate inquiries into why his father was not hired despite being warned not to interfere, (7) verbalization of his depression and its effect on his performance at work, (8) absenteeism, (9) forgetting to turn in documentation, (10) inability to complete simple tasks like completing forms necessary for his job, (11) asking co-workers for money for lunch, and (12) reacting angrily when an internal affairs investigation was opened regarding his inquiries into his father's job application and

13

decision not to hire. Based on these observations, Fair provided Murphree (the Sheriff) with a written request for a fitness for duty evaluation on Milstead.

Consistent with his obligation and authority to do so, Murphree considered the request and directed Milstead to submit to such an evaluation. This was the evaluation performed on March 29, 2021. Dr. Sarah Pepper, PhD performed the evaluation and concluded Milstead exhibited signs of depression and PTSD. She concluded "he is not considered fit for duty, due to concerns about concentration difficulties, psychomotor retardation, and lack of energy negatively affecting his productivity and his ability to focus on his work." She also indicated "concerns about his negative mood affecting his perception of his relationships with coworkers" and "[i]rritability . . . which could also affect his ability to interact with his coworkers appropriately and effectively." Dr. Pepper included several recommendations for Milstead, including additional psychological treatment, support groups, and discussion of different medications with his doctor. No timeframe was placed on these options, nor did she opine whether these would return Milstead to fitness for duty. Rather, she said that determination would have to be made after a follow-up fitness evaluation. The evaluation was given to Denton County on April 6, 2021 via secure email. A week later, Milstead was informed his employment would be terminated on April 14, 2021, based on the finding that he was not fit for duty.

The evidence shows Denton County had good cause for concern as to Milstead's fitness for duty. While he was not on patrol duty, he was still a licensed police officer who carried a firearm. He was still in a position in which he was required to exercise sound judgment and could require, at any time, the ability to adopt quick, effective, and reasonable courses of action. *See Heard v. City of Union City*, No. 1:15-cv-2228-MHC-

14

JKL, 2017 U.S. Dist. LEXIS 199548, at *28 (N.D. Ga. May 23, 2017) ("[b]eing a police officer . . . is not like being an assembly line worker, in that the tasks that must be performed on a daily basis are not routinely predictable . . . a law enforcement officer who is unable to perform a necessary task, even if that task makes up an indeterminately small portion of his work, may not be a qualified individual under the ADA). Thus, the fitness for duty examination was reasonable and necessary to ensure Milstead was able to perform the essential tasks of his position. *See Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) (finding fitness for duty evaluation was proper as it was job-related and consistent with business necessity). *See also Diaz v. City of Philadelphia*, No. 11-671, 2013 U.S. Dist. LEXIS 89232, at *10-11 (E.D. Pa. June 25, 2013) (noting, "'[a]ny police job, including an 'inside' job, requires substantial maturity and presence of mind . . . psychological fitness is a prerequisite for many forms of police work").

The evidence showed Milstead's condition caused him to be unable to perform the essential duties of his position. It showed he could not do so with or without a reasonable accommodation, as discussed more thoroughly below. And, the evidence does not rise to the level of showing a genuine issue of material fact establishing that Denton County engaged in an adverse action without legitimate cause or that pretext existed. We therefore cannot find the evidence raised a genuine issue of material fact as to disability, qualification, adverse action, and pretext/causation.

<u>Issue Two—Failure-to-Accommodate Claim</u>

Through his second issue, Milstead contends the trial court erred in granting summary judgment on the ADA/TCHRA failure-to-accommodate claim where the

15

evidence established Milstead requested modest accommodation (additional leave) but Denton County refused to engage in the interactive process. We overrule the issue.

For a plaintiff to establish a prima facie case of discrimination based on an employer's failure to provide a reasonable accommodation, the plaintiff must show: (1) that he is an individual who has a disability within the meaning of the ADA; (2) that an employer covered by the statute had notice of his disability; (3) that with reasonable accommodations he could perform the essential functions of the position; and (4) that the employer has refused to make such accommodations. *Davis*, 188 S.W.3d at 758.

Many deficiencies were noted in Milstead's performance at work. He appeared to be disheveled and unkempt, picked at sores on his scalp, had puffy and dark eyes, and admitted his depression was affecting his ability to perform work. His talk at work seemed paranoid and he persisted in inquiries regarding his father despite being told to stop. He failed to turn in reports and complete other tasks he was expected to complete. Milstead was unable to maintain regular attendance at work. And, given his history, it was unclear whether the accommodation, i.e., the additional two weeks off, would remedy the deficiencies.[3] The pattern of his episodic condition suggested it would not. Even Milstead admitted he was not ready to return to work at the time of the evaluation. He stated he would be ready to do so in two weeks, but there is no indication in the record whether he actually would have been able to return at that time.

---

[3] While Milstead contends he requested this accommodation, that is not entirely clear. "[I]t is the responsibility of the individual with the disability to inform the employer that an accommodation is needed." *Taylor v. Principal Fin. Group*, 93 F.3d 155, 165 (5th Cir. 1996). "If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one." *Id.*

16

Further, there was no indication of when Milstead might be able to perform his duties. The record established that Dr. Pepper provided recommendations to help Milstead try to return to work. But, there was no timetable placed on that, and it wholly depended on Milstead taking those actions and for those actions and interventions to be successful. There is no evidence of whether those would take place, how long those things would take, or whether any of them would result in Milstead's ability to perform the essential duties of his position. The law is clear that indefinite leave is not a reasonable accommodation, and it was Milstead's duty to identify a reasonable accommodation. *Monroe v. Fla. Dept. of Corr.*, 793 F. App'x 924, 927 (11th Cir. 2019); *see also Silva v. City of Hidalgo*, 575 Fed. App'x. 419 (5th Cir. 2014) ("'Reasonable accommodation does not require an employer to wait indefinitely for the employee's medical conditions to be corrected."). Milstead did not show he was able to perform his duties with or without a reasonable accommodation, and therefore, we cannot find the trial court erred in granting summary judgment on Milstead's failure to accommodate claim.

Issue Three—Retaliation Claim

In his third issue, Milstead asserts the trial court erred in granting summary judgment on the ADA/TCHRA retaliation claim because the evidence showed protected activity, materially adverse actions, and a causal connection supported by temporal proximity and a pattern of escalating discipline. We overrule the issue.

Denton County argues Milstead failed to adduce legally sufficient evidence to support the elements of his prima facie case. Further, Denton County had a legitimate, nondiscriminatory, or nonretaliatory reason for discharging Milstead because he was not

17

fit for duty and Milstead could not establish his termination was pretextual, discriminatory, or retaliatory.

To prove retaliation, a plaintiff must show he engaged in a protected activity, the defendant took adverse action against him, and "illustrate a causal link between the protected activity and the adverse action." *Bratu*, 2024 Tex. App. LEXIS 4585, at *14. The initial satisfaction of the causal link is "not onerous" and may be accomplished "through mere comparison of the timing between the protected activity and the adverse action. If close in time, then the link may be satisfied." *Id.* But, that is not true if the employer provides evidence of a legitimate reason for the adverse action. *Id.* Under those circumstances, the employee is required to produce evidence showing the action would not have occurred but for the protected activity. *Id.* This is significantly more difficult to establish. *Id.* at *15.

Milstead claims he was terminated for using his FMLA leave. He contends this was shown, at least in part, by the close proximity in time to his taking leave, being investigated, having to submit to a fitness for duty examination, and being terminated from employment. Even assuming he satisfied the relatively low burden of showing he engaged in protected activity, i.e., taking FMLA leave, that he was terminated for it, and that there is a causal connection between the two, we cannot find in Milstead's favor. This is because Denton County articulated a legitimate, non-discriminatory, or non-retaliatory reason for terminating his employment.

As described herein, Denton County terminated Milstead's employment after a finding that he was not fit for duty. Milstead had previously taken FMLA with no adverse

18

consequences. The record shows Denton County engaged with him over the span of many weeks to help him manage his conditions. There were no negative consequences at that time. It was not until Milstead's condition and work performance deteriorated to the point of necessitating a fitness for duty evaluation that any so-called negative consequences came into play. And, Denton County did not terminate Milstead's employment until a finding was made that he was not fit for duty. This was a legitimate, non-discriminatory, non-retaliatory reason to terminate Milstead's employment. Moreover, Milstead's evidence does not establish the reason was pretextual. *See, e.g., Reed v. Metro. Gov't of Nashville & Davison County*, 286 Fed. App'x. 251, 355-56 (6th Cir. 2008) (finding district court correctly dismissed retaliation claim where independent fitness for duty evaluation was sufficient justification for temporary decommission and no pretext was shown).

### Issue Four—FMLA Interference and Retaliation Claims

Lastly, Milstead claims the trial court erred in granting summary judgment on the FMLA interference and retaliation claims because the evidence showed entitlement to leave, interference (including mis-designation), prejudice, and adverse actions causally connected to the exercise of FMLA rights. Denton County asserts Milstead was terminated because he was not fit for duty, and the decision to discharge was made prior to and apart from his mention of his FMLA leave. We resolve this issue against Milstead.

The FMLA provides that an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under FMLA. 29 U.S.C. § 2615(a)(1). It further forbids an employer "to discharge or in any other manner

19

discriminate against any individual for opposing any practice made unlawful" by FMLA. 29 U.S.C. § 2615(a)(2).

To establish an interference claim, a plaintiff must show "(1) that he . . . was entitled to FMLA leave, (2) that some adverse action by the employer interfered with his . . . right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights." *Sabourin v. Univ. of Utah*, 676 F.3d 950, 958 (10th Cir. 2012) (quoting *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006)). If these elements are shown, the employer will still prevail if it shows that the plaintiff "would have been dismissed regardless of [his] request for, or taking of, FMLA leave." *Id.*

As noted above, we review retaliation claims under the burden-shifting framework for employment-discrimination claims that originated in *McDonnell Douglas Corp.*, 411 U.S. at 802-03. To establish a prima facie case of retaliation, a plaintiff must prove that "(1) [he] engaged in a protected activity; (2) [the employer] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action." *Sabourin*, 676 F.3d at 958. If he establishes a prima facie case, the employer must then produce a "legitimate, nonretaliatory reason for its termination decision." *Id.* If the employer produces such a reason, the burden shifts back to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's explanations for terminating [his] employment are pretextual." *Id.*

20

In the case before us, Milstead was terminated while on administrative leave pending the internal affairs investigation pertaining to his inquiries about his father's application and the decision not to hire him. He was not on FMLA at that time, and the record does not show there was a pending request to take FMLA. Instead, the evidence shows only that Milstead had previously taken FMLA, and he stated he had approximately two more weeks of FMLA available to him because he returned to work prior to the expiration of his FMLA leave. Further, Denton County terminated Milstead's employment based on his fitness for duty evaluation. *See Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010) (right to commence FMLA leave is not absolute, and an employee can be dismissed, preventing the employee from exercising the right to commence FMLA leave, without thereby violating FMLA, if the employee would have been dismissed regardless of any request for FMLA leave). Therefore, there is no evidence his termination was in any way linked to his FMLA leave.

## CONCLUSION

Having overruled each of Milstead's issues, we affirm the judgment of the trial court.

Alex Yarbrough
Justice

21